# Blenon's Estate.

[ April 17, 1843. ]

Testator devised the residue of his estates "to the different institutions of charity and beneficence, constituted and established at Philadelphia, for the relief of the unfortunate and of those who live under the infliction of infirmities, and of every sort of privations, without any distinction of sect or religion;" and excepted "from these different institutions of charity and beneficence, all those which are directed, conducted and administered by ecclesiastics, whatever may be the sect to which they belong." *Held:*—

1. That no friendly, beneficial or literary society, nor any incorporated society, nor any society located out of the corporate limits of the city of Philadelphia, was entitled to take under the will.

2. That all societies for the alleviation of the privations and infirmities of individuals, whether white or coloured, by supplying or relieving their *bodily* and personal wants and necessities *gratuitously*, and no others, were entitled.

3. That societies of a religious character, whose benefits were exclusively confined to a particular sect, were not excluded; the true construction of the will being, that all should participate, be their sect or religion what it might.

4. That the fact of a clergyman being *one* of the managers of an institution, would not exclude such society from the benefits of the will; the institutions excepted being those *exclusively* or *mainly* under ecclesiastical direction.

[Blenon's Estate.]

APPEAL from the orphans' court of Philadelphia.

This case depended upon the construction of the eighth item of the decedent's last will and testament, dated May 12th, 1836, as follows:

"Eighthly, I give and bequeath, in full ownership, to the different institutions of charity and beneficence, constituted and established at Philadelphia, for the relief of the unfortunate, and of those who live under the affliction of infirmities and of every sort of privations, without any distinction of sect or religion, and after all the legacies and donations which I make herein shall be complied with and discharged, the residue of my estate, so that no individual shall be able to make any claim, as I do not recognise any other heirs or claimants of my estate, which is the fruit of my labour and industry, except the persons designated in the present will, which, without any restriction or addition, is positively the expression of my last will and intentions. I except from these different institutions of charity and beneficence all those which are directed, conducted and administered by ecclesiastics, whatever may be the sect to which they belong. Spiritual affairs alone and not temporal are competent to them. Finally, I do not think that their kingdom is of this world."

The accounts of the executors to the above estate having been filed, auditors were appointed, August 18th, 1837, by the orphans' court, to settle the said accounts and make distribution of the assets according to law. In the performance of the latter part of their duty they made the following report, to wit:

"The principal questions that arose under the construction of the eighth, or residuary clause of the will, were as follows, viz.:—1. The meaning of the expression 'different institutions of charity and beneficence.' 2. The construction of the words 'constituted and established.' 3. The construction of the words 'at Philadelphia.' 4. The construction of the rest of the sentence defining the objects of

[ Blenon's Estate.]

the societies as to relieve afflictions, of infirmities, and of every sort of privations.   5.  The expression 'without any distinction of sect or religion.'   6.  The construction of the excepting portion of the residuary bequests.

"First:—A large number of societies usually known as beneficial societies presented their claims under the will, and it was in evidence that they were not, strictly speaking, charitable institutions for the relief of the poor, but by their fundamental regulations each member was bound to contribute an equal amount to the treasury of his society, which thus formed a common fund for the relief of the members when sick or disabled from work, or to be paid to the family of a deceased member for funeral expenses, and these benefits were claimed by the members as a pecuniary right, the non-payment of which might be followed, on their part, by a suit at law to recover the same.

"Objections were made by the counsel for other societies, that these institutions were not societies of charity and benevolence, within the meaning of the testator, but were to be viewed merely in the light of mutual assurance companies, in which each member put in a given amount of his money, and in turn drew out from the common stock an ascertained amount as his due, and not as a favour or a charity; that the testator meant to confine the bequest to institutions to relieve the poor and infirm, and that these societies could not be fairly considered as being either for 'charity,' or 'beneficence.'

"On behalf of this class of societies, it was contended that they were distinctly embraced within the letter and spirit of the will, a fair construction of which would include these societies, that if their objects were not in the popular sense for charity, they were strictly for acts of beneficence, and that those acts of beneficence were extended only to those labouring under the 'infirmities, afflictions, and privations,' referred to by the testator.

"A very elaborate and interesting argument took place

between the contending counsel, not only on the construction of this clause of the will, but of the others, and of the minor points that incidentally arose; the parties went fully into the merits and the law, and cited many authorities, but as this report is necessarily long, the auditors will, throughout, content themselves with a brief statement of the various questions that were discussed, and of their decision in each given case; as any other course would, in their opinion, unduly amplify the report without any practical good to result therefrom, and in case of any exceptions hereafter, the points will be much better presented by the counsel and parties interested.

"In stating the various decisions, the surviving auditors have the pleasure to state that in all the questions presented, their opinions were unanimous, and all the important principles were settled and agreed upon by them in the lifetime of their lamented colleague, Mr. Biddle. In this case the auditors are of the opinion, that these societies are within the fair construction of the will, as institutions of beneficence, for the relief of those living under the 'affliction of infirmities, and of every sort of privation,' that they are very numerous, and their existence must have been known to the testator; that the objects were to relieve their members from the humiliation of absolute pauperism; while the relief afforded was only to be in the emergencies contemplated by the testator. The auditors are of opinion that these institutions are institutions of beneficence, under the will, and they consider furthermore, that similar principles were many years ago settled, in the decision of similar questions which arose upon the construction of John Keble's will; Supreme Court, December Term, 1809.

"2d. The words 'constituted and established.' Under the construction of these words, unincorporated societies cannot participate in the benefits of the will; the auditors are of opinion that the testator meant to include none but societies organized, constituted and established in some

[Blenon's Estate.]

tangible and legally recognised shape, to wit, those whose existence or establishment arose and were established by law, to wit, through a charter. Should an opposite con- struction prevail, no rule could be fixed or limit designated, whereby the organization of any number of individuals could be deemed or construed to mean a regularly estab- lished society, and the auditors think that the safe and legal construction of these societies, is, to consider them in no other light than that of a partnership, and that the charter alone gives vitality to the organization of a number of individuals. This decision will exclude from the bene- fits of the will, all the societies after that numbered 162, on the eighth and ninth sheets of this report, except No. 177 and 178, all of which were incorporated after the death of the testator, and not being entitled to participate in the fund at the time of his decease, no subsequent act could give them this right.

"3d. The words 'at Philadelphia.' While some con- tended that the benefits were meant only for those societies organized within the corporate limits of the city of Phila- delphia, others contended that every institution within the bounds of the city and county was meant. The auditors do not adopt either of those views, but think that the words 'at Philadelphia' mean that which in popular esti- mation of a great town is usually understood to be city, viz., the town and suburbs or adjoining built districts; and under this construction they are of opinion, that societies constituted and established in the corporate limits of the city of Philadelphia, the incorporated townships and dis- tricts of the Northern Liberties, Kensington, Spring Gar- den, Southwark, Moyamensing, and the borough of West Philadelphia, are entitled to participate.

"4th. The construction of the words 'for the relief of the unfortunate, and of those who live under the affliction of infirmities and of every sort of privations.' A number of societies for diffusion of education and knowledge, by means

of seminaries of learning and libraries, together with other societies whose objects were meritorious, presented their claims under this portion of the will.  If the testator had meant to include every meritorious society or institution, it is fair to presume he would have used apt words to have expressed his intentions, and not by distinct provisions have limited his bounty to 'institutions of charity and beneficence for the relief of the unfortunate, &c.'

" The auditors think that the infirmities and privations referred to were of a bodily character, such as poverty, sickness, or decrepitude, except perhaps the mental privation of reason.  This construction will exclude all infant schools, sunday schools, and other seminaries of learning, all library companies, the colonization society, the abolition society, the society for alleviating the miseries of public prisons, the fuel saving society and others, all of which are collected and numbered, Nos. 5, 11, 16, 21, 22, 44, 55, 85, 102, 125, 142, on the 2d, 3d, 4th, 5th, 6th and 7th sheets of this report.

" The Wills' Hospital is also to be excluded; this is a legacy by J. Wills to the city of Philadelphia, in trust, to dispose of the fund for a particular object.  The hospital itself is only a building, and not an institution, the bequest is but an appropriation of James Wills' money to a particular object of charity, and the city of Philadelphia is the trustee to carry that object into effect: the Wills' Hospital cannot with propriety be called an institution constituted and established within the meaning of the will, or the implication of the law.

" 5th.  The expression 'without any distinction of sect or religion.'  It was contended that no societies of a religious character could come in, if their benefits were exclusively confined to a particular sect: but the auditors think that the true construction of this portion of the will is, that all societies should receive the fruits of the testator's estate, be their sect or religion what it might.

[Blenon's Estate.]

" 6th. The clause excepting institutions governed by ecclesiastics, &c. The auditors are of opinion that the mere fact of a clergyman happening to be one of the directors or managers of an institution, should not exclude a society from the benefits of the will; they think that the institutions referred to in this excepting clause, were institutions exclusively or mainly under ecclesiastical direction or influence. Such as churches and chapels, monasteries, convents, &c.

" No such institutions made any claims before the auditors, and the question never arose on this head except in the case of St. John's orphan asylum. This institution is wholly charitable, being for the relief and support of poor children; it is chiefly endowed by members of the catholic church, though its benefits are not necessarily, by the terms of their by-laws, confined to members of that sect. It is governed by a board of thirteen directors, two of whom are the bishop of the catholic church, for the time being; and the pastor of St. John's catholic church, for the time being; the other eleven being laymen by the express regulation of the society.

" It was contended, that as the bishop and pastor were directors in right of their offices, this was such an ecclesiastical direction as would exclude this institution, but the auditors are unable to concur in that view, the two officers referred to forming but a very small integral portion of the board, and the laymen having in numbers, an overwhelming and controlling influence. They accordingly report this institution as one among those entitled for the benefits.

" Some other questions arose, which the auditors think right to present to the court, viz.:—7th. The right of societies composed of negroes or people of colour, to participate in the bequest. It was objected that the testator never meant to include these societies, and that under the authority of the case of *Hobb* v. *Fogg*, in 7 Watts, they are destitute of the rights of citizenship. The auditors find nothing on the face of the will to warrant such a con-

struction, no such limit to the testator's bounty being therein fixed, and the decision of the supreme court goes solely to the question of their political and not civil rights.

" 8th. Several societies were established for mixed objects, some within the meaning of the will and some not, as for instance, the German Society, which is a charitable society having a library; the auditors think that these institutions should participate because of the parts within the meaning of the will, if such parts were the main objects of the society and not mere incidents."

To this report numerous exceptions were filed, upon which the orphans' court made the following decree:—
" This cause came on to be heard upon exceptions to the report of the auditors appointed by this court, and was argued by counsel, on consideration whereof, it was ordered, adjudged and decreed by the court, that so much of the auditors' report as relates,—1. To the construction of the words "constituted and appointed." 2. To the construction of the words " at Philadelphia." 3. To the construction of the expression "without distinction of sect or religion." 4. To the construction of the excepting portion of the residuary claim, be and the same is hereby confirmed.

" And it is further ordered, adjudged, and decreed,—1. That no friendly or beneficial society is entitled to any share in the bequest of the testator. 2. That all societies for the alleviation of the privations and infirmities of individuals whether white or coloured, by supplying or relieving their bodily and personal wants and necessities gratuitously, and no others, are entitled to a portion of a share in the bequest of the testator. 3. That Wills' Hospital is entitled to a share in the bequest of the testator, and that so much of the said auditors' report as is inconsistent with this decree, be and the same is hereby reversed.

" And it is further ordered, that the said report be referred back to the said auditors, to make from their notes a detailed statement of the several societies entitled to, and ex-

x

[ Blenon's Estate. ]

cluded from a participation in the bequest of the testator by the principles of the decree, with directions to report on or before the 30th inst."

An appeal was taken from this decree to the supreme court, and a *certiorari* issued to the orphans' court. A number of exceptions from various parties in interest were filed—and after argument, the following decree was made by the supreme court.

"It is hereby ordered and decreed by this court, that so much of the decree of the orphans' court as gives portions of the fund remaining to be distributed, according to the will of Peter Antoine Blenon, to the societies constituted and established within the limits of the incorporated townships and districts of Northern Liberties, Kensington, Spring Garden, Southwark, Moyamensing, and the borough of West Philadelphia, which are located out of the corporate limits of the city of Philadelphia, and therefore not the objects, as we conceive, of the testator's bounty, according to the tenor of his will, is annulled and reversed, and the residue of the decree is affirmed. So that the whole fund shall be paid to, and distributed among, the remaining societies mentioned in the decree of the orphans' court, as entitled to portions thereof. And in order to effect this, it is referred to the clerk of this court to ascertain the societies mentioned in the decree of the orphans' court, which are located within the said incorporated townships and districts of the Northern Liberties, Kensington, Spring Garden, Southwark, Moyamensing, and the borough of West Philadelphia. And the same being thus ascertained, it is further ordered, that they be stricken out of the decree, as not entitled to any participation in the fund remaining to be distributed agreeably to the will."*

---

* The subject of bequests for pious and charitable uses, was very fully considered by the circuit court of the United States for the eastern district of Pennsylvania, at the April term, 1833, in the case of *Magill* v. *Brown*, which involved the construction of the will of Sarah Zane, deceased.

[ Magill *v.* Brown. ]

The following sections of the will are those reviewed in the opinion of the court.

9. I give to the yearly meeting of Friends, held in Philadelphia, of which I am a member, eight acres of meadow land, situate on Greenwich Point road, being part of thirty acres belonging to 'my dear father, with the flats thereunto belonging, to be kept by the yearly meeting aforesaid for the purpose of a fund, the income of which, after keeping it in good order, to be paid as an annual subscription into the yearly meeting's stock.

10. I give most affectionately to the five monthly meetings of women Friends, held in Philadelphia, viz., Philadelphia monthly meeting, monthly meeting of the northern district, monthly meeting for the southern district, monthly meeting for the western district, and Green street monthly meeting —to each of the above said monthly meetings two hundred dollars, making in the whole one thousand dollars, to purchase ground rents; the income whereof I request to be received annually in the monthly meetings' collections, towards the relief of the poor members belonging thereto.

11. Whereas, about the year seventeen hundred and fifty-nine, Captain Newcastle, an Indian chief or messenger, ordered thirty pounds, Pennsylvania currency, to be paid to my dear father, for the use of his two cousins, a boy and a girl. The boy soon after died. The girl, named Betty, received a part of the above thirty pounds at different times, by Thomas King, an Indian chief; but as no information could be obtained of said Betty for forty years; and the residue of the thirty pounds is now in my possession, I am desirous that the full sum of thirty pounds principal, with the interest from the year seventeen hundred and fifty-nine until the time it is paid, which I desire to be into faithful hands; therefore I will and direct my executor to pay to the treasurer of the committee of the yearly meeting of Friends, held in Philadelphia, appointed to relieve the Indians, for the benefit of said Indians, according to their best judgment in justice and equity.

12. I give to my executors a legacy or sum of three hundred dollars, to be paid by them to the treasurer of the committee of the yearly meeting of Friends, held in Philadelphia, appointed to relieve the Indians, to the benefit of said Indians.

17. I give to my executors the sum of one thousand dollars, to pay to the treasurer of the committee appointed by the yearly meeting of Friends, held in Baltimore, for the transactions of the relief and benefit of the Indians, that the said yearly meeting, with the yearly meeting of Friends, held at Mount Pleasant, in the state of Ohio, hath under their care, toward civilization, having the tribe of Tuscaroras first in view, if to be found within two years.

18. I give affectionately to Friends composing the Baltimore yearly meeting, five hundred dollars, to be realized in that city, so that the interest or income thereof be annually paid into their collection toward their yearly meeting stock, if one exists; if not, I will, if it be the mind of Friends belonging thereto, the encouragement to establish one.

19. I give affectionately to Friends composing the yearly meeting, held at Mount Pleasant, state of Ohio, five hundred dollars, to be realized so that the interest or income thereof be annually paid into their collection toward their. yearly meeting stock, if one exists; if not, I will, if it is the mind, and

[Magill *v.* Brown.]

agreeable to the Friends belonging thereto, the encouragement to establish one.

20. I give to the select members belonging to the monthly meeting of women Friends, held at Hopewell, Frederick county, Virginia, five hundred dollars, to be realized in the town of Winchester, in the same county, the interest or income issuing therefrom to be annually paid into the treasury of the above said monthly meeting's stock, towards the relief of the poor belonging thereto.

21. I give to my dear friends composing Centre preparative meeting, belonging to Hopewell monthly meeting, the sum of five hundred dollars towards enlarging Friends' monthly meeting-house in Winchester, if that meeting think it expedient, and to assist building a stone wall, so as to enclose the whole lot whereon the said meeting-house is erected. ·

22. I give to the citizens of Winchester above said, one thousand dollars to purchase a fire-engine and hose, to be kept in best repair, with my affection and gratitude.

31. Whereas, the heir of the late Elizabeth Roberts, daughter of Joseph Galloway, formerly of Philadelphia, hath deposited a bond of one hundred pounds, Pennsylvania currency, in the hands of Wm. Rawle and Joseph Jenks, agents for the estate of Elizabeth Roberts' daughter, now in Great Britain; I, believing the above said bond to be given by my brother Isaac Zane, of Virginia, a number of years since—the bond for many years out of reach; the interest hath not, that it appears, been paid: I will and direct my executors to pay the said one hundred pounds principal, and the legal interest thereon from the day of its date till paid in full.

Lastly. I do nominate and appoint my respected friends Samuel Coates and                    of Philadelphia, and Jacob Rinker, of Virginia, executors of this my last will and testament; giving them, my above named executors, full power to sell by private sale my house in Chestnut street, to meet the payments herein directed; and if that be insufficient, to sell Marlbro' estate, in Virginia, belonging to my late brother, Isaac Zane: hereby revoking all former and other wills by me heretofore made, and declaring this to be my last will and testament. In witness whereof, I hereunto set my hand and affix my seal, in Philadelphia, this twenty-fourth day of the third month, in the year of our Lord one thousand eight hundred and nineteen."

The following elaborate and learned opinion was delivered by

BALDWIN, J.—This case arises on the will of Sarah Zane, a member of the society of friends, who in the body thereof, describes herself as of the city of Philadelphia: she died in Virginia, but as it has not been questioned, we shall assume this to have been the place of her domicil at the time of her death; the law of the state must therefore govern her disposition of her personal property, as well as of her real estate situated here. 1 Binn. 336, 44; 3 R. 318; 3 Penn. Rep. 187, 8.

The questions which have been made in the argument, and those which necessarily arise in the case, are of the most interesting kind; involving the capacity of the Quaker societies of this and other states, to take real or personal estate by devise, without a charter of incorporation; their right to enjoy

[ Magill *v.* Brown. ]

it for their own use, as a body united for the purposes of religion, charity and education; and what now are, by the law of the land, pious and charitable uses, for which valid donations can be made by deed or will.

In referring to the history of the settlement of this state, the principles of its first settlers, the character of its founder, his systems and institutions, it would seem not a little surprising, that such questions could have remained open till this time: if there are any subjects on which the law could be supposed to be settled, it would be the rights of religious societies and charitable establishments. If there was any part of the law of England which could be congenial to the spirit and policy of the colony, and likely to be adopted by a society of men who sought an asylum from persecution for religious opinion, it would be that which would afford the best protection in the enjoyment of their rights, privileges, immunities and estates, as a religious society. If there were any laws which they would be disposed to leave behind them, they would be those which grew out of feudal tenures, a spirit of persecution, or an established religion; the last laws which they would introduce, would be those which created a forfeiture of all land conveyed to a society incorporated for the purposes of charity and religious worship, according to their own consciences, without regard to the mode of celebrating divine service as prescribed by law, or which prevent a donation for such uses from taking effect, without a special license by charter or act of assembly. Such would be the natural conclusion from the known and practical principles of civil and religious liberty, which have distinguished the policy and jurisprudence of this state through all time, as founded on a system of "free and unlimited catholicism" in matters of religion, of expanded benevolence in matters of charity, and equality of rights in the enjoyment of property.

These leading features are so strongly impressed on the written laws, and enter so deeply into the customs and common law of the state, as to make it impossible to mistake the character and tendency of the system in the details of its legislation, by colonial authority, or the adoption of the statutes or common law of England. It is not conceivable that the Quaker settlers of this province should have introduced those laws of the mother country, which would incapacitate them as individuals, or a religious society, from taking, holding or enjoying property as a matter of right without a charter; or expose to a forfeiture to the proprietor, or mesne landlord, lands conveyed to them for the purposes of sepulture, religious worship, or charity, and above all, that William Penn should have adopted the statutes of Henry VIII. declaring the celebration of divine service according to the rites of the catholic church, to be superstitious, and conveyances for its use illegal and void; and the statutes of mortmain which make the enjoyment of property by a religious body, dependent on the pleasure and permission of the lord of the fee; while at the same time he excludes the statute of the 43 Eliz., and the mild and beneficent principles of the common law which that statute has been held to have restored.

The history of the society of Quakers, presents no instance of an incorporation:—did they adopt any rule of law, making one necessary to give them a legal capacity to purchase property? They have enjoyed it from the earliest time without a license in mortmain—is it liable to be now seized by the state

[Magill *v.* Brown.]

as forfeited by the purchaser? They have their own modes of worship and system of charities—are donations for their support to be regulated by the prohibitory statutes of a foreign country, or confined to the uses specified in its laws? 2 Ves. Sen. 475. They have kindred societies in other states—do the laws of this invalidate a bequest of money to them for purposes of piety and charity? These are questions which have been made by the counsel in their objections to the devise of the lot of ground to the yearly meeting of Philadelphia, and the pecuniary bequests to the several meetings of friends in this place, and in Maryland, Virginia and Ohio. The objections to the validity of the dispositions of this will, are not founded on any statutory law of Pennsylvania, but on the English statutes of mortmain, superstitious uses, and wills, alleged to be in force in this state by usage, though not adopted by any act of assembly. The principles of the common law have also been relied on, as supporting the objection to the capacity of the parties to take, for the want of an incorporation, as well as of an act of assembly, containing enabling provisions, analogous to the 43 Eliz., validating dispositions for religious, literary and charitable purposes, and giving jurisdiction to the courts to carry them into effect, as they can do in England.

The field of investigation is from its nature a broad one, and from the confined course which has been taken in discussing the law of charities in the various cases which have arisen is, in a great measure, a new one.

Though there are several statutes on the subject in England, prior to the 43 Eliz., no treatise or opinion contains a condensed or comparative view of the system of charities, which has grown out of them, so as to enable us by any authority of precedent, or adjudication, to ascertain the definite source of the various principles, which have from time to time, become embodied into the general course of the law of England. Nor have the courts of the United States, or of this state, brought into contrast or comparison, either the policy of the government of England and this country, in relation to religious establishments and rights of conscience, the general course of legislation pursued in either, or the principles of the common law independent of the statutes alluded to.

Proceeding on the assumption that the 43 Eliz. was the only foundation on which charities could be supported, in opposition to prior statutes, and that statute not being considered in force here unless re-enacted, the courts in this country have laid down principles, which resting solely on such assumption, cannot be considered as authoritative in their conclusions, if on a more thorough examination the premises on which they depend should appear to be erroneous. We trust that a review of the course of their adjudication on charities will show that it has not become so settled as to be sanctioned by the maxim of "*communis error facit jus,*" or that in endeavouring to extract the rules which must govern the law of charities from the constitution of the Union and this state, its statutes and usages, and the statutes and common law of England, we violate the respect due to the decisions of courts of high authority.

It is at all times proper to discriminate between the question directly presented for the deliberate consideration of a court, on which they exercise their judgment, by a solemn adjudication; and those observations which are

[ Magill *v.* Brown. ]

made by way of illustration, or mere declarations of what the law is, on any particular subject; the one is binding as authority, the other to be respected only as a mere opinion, or argument, which must have *its* influence, but cannot be enforced on our judgment.

If the supreme judicial tribunal of the state, or the union, have judicially considered the statutes of mortmain to be in force, this court is bound to take the law as settled; but if they have merely declared them to be so, without making such opinion the basis of their judgment, or have, in doing so, omitted to refer to the supreme law of the land, which bears on the question, this court may and ought to do what a higher one would do, notwithstanding any preconceived or expressed opinion—compare the constitution with the statutes, and be governed by the result.

The 3d section of the 3d article of the constitution of the United States prohibits a "forfeiture for treason except during the life of the person attainted;" the constitution of Pennsylvania extends the prohibition to all forfeitures by attainder, or *felos de se,* or death by casualties: it is at least worth the inquiry whether a forfeiture in fee is incurred by an alienation in mortmain; against which, no prohibition is to be found in any law of the state. In a word, whether a penal law of England has an effect, which the whole power of the federal and state government is incompetent to give to a conviction for the highest crimes known to their laws. 9 S. & R. 343.

This inquiry necessarily leads to an investigation of the common law, so as to find out whether these statutes are in affirmance or derogatory of its principles, which have been made the common law of the state so far as adopted or applicable to its policy; if they are of the latter character, then how have they become in force in Pennsylvania, and what is the evidence of their adoption by legislation or usage? As these statutes impose a forfeiture of the whole estate conveyed, the proposition that they are in force here ought to be considered as an affirmative one to be made out by those who assert, that an act lawful by the common law, is prohibited by a statute. The penal laws of England have been presumed not to be in force here; the burden of proof has always been held to be on those who allege a forfeiture, by an act punishable only by statute; and it ought to be clear and conclusive, especially on subjects which affect the rights to the transmission and enjoyment of property.

If there was any one subject on which the founder, the legislature, and the people of the colony, from its first settlement, were governed by a settled, unyielding course of policy, it was to facilitate the transmission of estates, to secure their enjoyment, and disincumber them of all restraints attendant on feudal tenures, the forms of conveyance, the ceremonies of investiture, and most emphatically to protect them from the operation of all laws growing out of an established religion, which at all interfered with the rights of conscience or the perfect freedom of religious worship. *Lyle* v. *Richards,* 9 S. & R. 326, 334, 359.

The charter of privileges of 1701, the colonial laws, both the constitutions of 1776 and 1790, and the laws of the state, are in the same spirit which induced the people, in their first act of assuming independence, and establishing government by their own authority, to prescribe the following oath to the

[ Magill *v.* Brown. ]

members of the convention who formed their first constitution :—" That I will oppose any measure that shall or may in the least interfere with or obstruct the religious principle or practice of any of the good people of this province, as heretofore enjoyed." Conv. of Penn. 39. The constitution was in the spirit of this oath, and declared the rights of religious societies and corporate bodies held according to the usage of the colony to be inviolable ; we have, therefore, a plain rule of decision by the supreme law of the state, if the nature and extent of such usage can be judicially ascertained.

The enjoyment of real estate in perpetuity, by any body incorporated by a written charter, or one presumed by law from evidence of long possession and exercise of corporate franchises, is *mortmain per se;* if on a review of the legislation and custom of the colony before, and of the state after the revolution, it shall appear, that their rights have been the subject of the most continued favour, and their protection is provided for in the most explicit manner, it must be deemed conclusive evidence of the general policy of the state, at least, if it does not establish the utter incompatibility of any incapacity in any body of men not only to take, but to enjoy an estate to their own use, with the whole scope and tenor both of its written and common law.

The strong constitutional position, which has been assumed by the senior counsel of the respondent in this case, has induced us to examine it with a degree of attention equally called for by the magnitude of the questions involved, and by the conclusions which we have felt ourselves bound to adopt ; in some respects at variance with the views of the judges of the supreme court of the United States as to the necessity of an actual incorporation to give the capacity to take; and of those of this state, to enable a corporation to enjoy an estate. We think, however, that it will be found to accord with all the great leading principles and rules which have been too firmly established by themselves to be now shaken, and that their minds would have come to the same conclusion as ours have done, if the same materials for investigation had been presented to them.

In reviewing the judicial history of this state, it is believed that there will be found no decision, that an incorporation is necessary to give to any association of individuals, the capacity of taking and enjoying an estate in perpetuity, either by the assumed name of the society, or by trustees for their use; if such a rule exists, it is only by the common law as adopted here.

Neither is there an adjudged case, turning on the statutes of mortmain, by which any estate has ever been vested in the commonwealth, by a forfeiture incurred in consequence of an alienation to a corporate body, without license, charter or law; or any evidence that such license was ever granted by the proprietary or governor, or any public grant made with a clause of *non obstante statuto,* in any patent, charter or act of assembly, under the colonial or state government; nor does the word mortmain appear on the statute book for one hundred and fifty years from the date of the charter to Penn.

This unbroken silence would have been taken as conclusive evidence that the British statutes were deemed wholly inapplicable to the fixed policy of the colony and state, its usage and fundamental laws, if the contrary opinion had not been expressed by the judges of the supreme court of the state, and adopted by the legislature at the present session. Hence arises the impor-

[Magill v. Brown.]

tance, as well as delicacy, of the questions involved in this cause; to consider them open after the declared opinion of both departments of the government, may seem to indicate a want of respect to their authority, but when we feel convinced that there is a law of higher obligation which must guide our judgment, we are bound to follow it.

The view which we feel constrained to take of the constitutions of 1701, 1776 and 1790, all of which remain in force, so far as respects the rights of property, conscience and religious worship, is this: that all bodies united for religious, charitable or literary purposes, though without a written charter or law, are to be considered as corporations by prescription, or the usage and common law of the state, with all the attributes and incidents of such corporations by the principles of the common law, and entitled to all rights which are conformable to the customs of the province. From this view it results, that if the statutes of mortmain apply to bodies whose charters are in existence, they apply equally to those whose charters are presumed from prescription: a brief summary of these provisions will show that they embrace all corporations of either kind.

The 9 Hen. III. ch. 36, declared gifts made to any religious house to be void, and that the land given should enure to the lord of the fee: the 7 Edw. I. prohibited all alienations in mortmain under a like forfeiture. These statutes were evaded by fictitious recoveries, till the 13 Edw. I. took away their effect: a new mode of evasion was then invented by conveyances in trust for uses in mortmain, so that the profits went to religious persons; the 15 Rich. II. extended the former statutes to such uses, and to all guilds, fraternities, towns, and cities which have perpetual community, and all others which have offices perpetual, though not people of religion. Keb. St. 5, 33, 46, 181; 1 Ruff. St. 9, 32, 100, 401, 2.

The 23 Hen. VIII. ch. 10, prohibited conveyances to any bodies not incorporated, for the use of churches, &c., to have obits perpetual or the continual service of a priest for ever, and declared them void, but there was an express saving of the right of devising in mortmain by the custom of cities and towns corporate. Keb. St. 403, 404; 2 Ruff. St. 171, 172.

The statute of wills of 34 and 35 Hen. VIII. contained an express exception of devises to corporations. Keb. St. 562; Ruff. 333, 4.

Such is the substance of the English statutes, which have been considered as the clogs upon dispositions, to pious and charitable uses, which have been removed by the 43 Eliz. in England: if the question of their application to the state of things in this colony was a new one, we should deem it apparent that they were never practically extended to it. "It is the true principle of colonization that the emigrants from the mother country carry with them such laws as are useful in their new situation, and none other." 3 Binn. 596.

That the law of charities as it rests on the 43 Eliz. is not only useful, but peculiarly adapted to the policy of the state is unquestioned; it is therefore difficult to account for the prevalence of the opinion that it is not in force, or that any statutes repugnant to its provisions, should have been considered as practically adopted: yet such is undoubtedly the apparent tendency of judicial opinion for the last twenty-five years.

In 1808, the judges of the supreme court, made a report to the legislature

[ Magill *v.* Brown.]

pursuant to a resolution calling on them to state, what English statutes were in force, in which they declare "conveyances to superstitious uses absolutely void by these statutes, and conveyances to corporations unless sanctioned by charter or act of assembly, to be so far void that they have no capacity to hold the estates for their own benefit, but subject to the right of the common-wealth, who may appropriate them at their own pleasure; in other words that such conveyances have no validity for the purpose of enabling the corporation to hold in mortmain." They consider them as standing on the same footing as conveyances to aliens. 3 Binn. 626; *Leazure* v. *Hillegas,* 7 S. & R. 319, 22.

In *M'Girr* v. *Aaron,* they declared a devise to an officiating priest, and his successors not being a corporation sole, was against the policy of the law, and void as tending to a perpetuity. 1 Penn. Rep. 51. In the case of the *Methodist Church* v. *Remington,* they say—"The statutes of mortmain, too, which deprive corporations of the capacity to hold," &c., and consider the legislature as evincing "an evident jealousy of clerical monopoly," though they refer to no act in which it had been expressed. They also decided, that a convey-ance for a religious society composed of members, a majority of whom re-sided out of the state, was not good under the law of 1730; and that the trust not being sanctioned by any legislative recognition, they would not lend their aid to carry it into effect. In *Witman* v. *Lex,* they seem to take for granted, that at common law an incorporation was necessary to give a capacity to take and hold in perpetuity, 17 S. & R. 91; though it was dispensed with by the custom of the province. We should have felt bound by these opinions, if the court had taken a view of the constitution and legislation of the state on the subjects to which they relate, and given them a deliberate construction; but as they have not been called upon to declare the meaning of any, but the act of 1730, or of the provisions of any of the constitutions, it cannot be ex-pected, that the law can be considered as settled until their provisions had been brought under judicial notice.

In the case of the *Baptist Association* v. *Hart's Executors,* the supreme court of the United States have decided that a bequest of personal property to the plaintiffs as trustees was not valid for want of an incorporation, at the time of the devise, 4 Wheat. 28; and the decision was approved in the case of *Inglis* v. *The Trustees of the Sailor's Snug Harbour,* 3 Pet. 114. This case was ruled according to the law of Virginia, in which state the 43 Eliz. had been re-pealed; we may therefore consider it as a case settling a question of a local, rather than of a general nature; it has not at any rate such an application to the law of Pennsylvania, as to control this case, if it should appear to be em-braced in the provisions of any act of assembly or constitution of the state or to rest on its known and recognised usage.

So far as these opinions of both courts rest on general principles affecting this case, they are also open to all rules which have been laid down in other cases by the same authority, to which it is thought best to refer, before entering on a review of the general course of the law of England or of this state.

The last case which has arisen in the supreme court of the state, is the *Methodist Church* v. *Remington.* In giving their opinion, the chief justice uses

[Magill v. Brown.]

this strong language, "The decision in *Witman* v. *Lex*, is full to the point, that a trust in favour of an incorporated religious or charitable society, is an available one." As the statute 15 Rich. II. expressly applied to conveyances in trust, or for the use of religious persons, in mortmain, we may consider this statute as not in force in this state; so that the objections growing out of the statutes of mortmain, will be confined to those of Hen. III. and Edw. I. In relation to superstitious uses, the court observe,—"The present is not a superstitious use, and indeed it is not easy to see how there can be such a thing here, at least in the acceptation of the word by the British courts, who seem to have extended it to all uses which are not subordinate to the interest and will of the established church;" so that an inquiry into this subject is not closed. In *M'Girr* v. *Aaron*, there were no trustees, and though the court held the devise to an officiating priest void, because he was not a corporation; yet they declared it good in case of the congregation, though not incorporated, (1 Penn. Rep. 51, 52,) on the principle, that "a gift to a charitable use shall not fail for want of a trustee, but vest as soon as the charity has acquired a capacity to take." As the bequest in the case of the baptist association failed only for the want of a trustee capable at the time of the devise, though there was an incorporation afterwards, we cannot consider it as authority in this state, where a different principle is established—the bequest would have been good according to *M'Girr* v. *Aaron*.

In examining the decisions of the supreme court of the United States, which precede and follow the baptist case, it appears, that they have established a different principle as to devises of real estate for charitable uses, or for the use of religious societies which are not incorporated; so as to leave that case applicable only to a bequest of money or personal property, even in Virginia. In *Terrett* v. *Taylor*, land in or near Alexandria, was conveyed to two persons, and the church-wardens of the parish for the time being, and their successors in office, for the use and benefit of the church in said parish; the deed was held to operate by way of estoppel, to confirm to the church and its privies, the perpetual and beneficial estate in the land, though it was not incorporated, and church-wardens were not capable of holding an inheritance in land by succession; 9 Cranch 43, 53; 9 Wheat. 455, 464. The court remark, "And in our judgment, it would make no difference, whether the episcopal church were a voluntary society, or clothed with corporate powers, for in equity as to objects which the laws cannot but recognise as useful and meritorious, the same reason would exist for relief in the one case as the other. Laws enacted for religious purposes, evidently presuppose the existence of the episcopal church, with its general rights and authorities growing out of the common law;" the church was capable of receiving endowments of land, and that the minister of the parish was during the incumbency, seized of the freehold of its inheritable property, as emphatically *persona ecclesiæ*, and capable as a sole corporation of transmitting the inheritance to his successors; 9 Cranch 45, 46, 329; 9 Wheat. 455, 464. In *Clark* v. *The Town of Paulet*, they say, "The property was in fact and in law, generally purchased by the parishioners, or acquired by the benefactions of pious donors. The title thereto was indefeasibly vested in the churches, or rather in their legal agents, 9 Cranch 49, or representatives entitled to take the donation, 9 Cranch

[Magill *v*. Brown.]

329." "The true legal notion of a parish church, is a consecrated place, having attached to it the right of burial, and the administration of the sacraments. Every such church, of common right, ought to have manse and glebe, as a suitable endowment, and when there is a church actually in existence, a grant to it is in effect a grant to the parson and his successors, as an endowment to be held *jure ecclesiæ*." 9 Cranch 329; 9 Wheat. 464. The parson has a qualified fee, but the land becomes the perpetual inheritance of the church. 9 Cranch 47, 53, 329; Co. Lit. 341 a. b.; 2 Mass. Rep. 500.

In *Beatty* v. *Kurtz*, the court decided that the laying out and marking a lot in the plan of a town, "for the Lutheran church," was a good and valid disposition—though it was not then organized, and was never incorporated as a religious society, but was a voluntary association, acting in its general arrangement, by committees and trustees chosen from time to time; or any church actually in existence, or any grantee capable of taking. It was supported as a dedication of the lot to public and pious uses, and the enjoyment decreed to the committee of the society. 2 Pet. 580, 81, 83, 85. The court take a ground which applies with great force to the law and constitution of Pennsylvania, as will appear hereafter.

"The bill of rights of Maryland gives validity to any sale, gift, lease or devise of any quantity of land, not exceeding two acres, for a church, meeting or other house of worship, and for a burying-ground, which shall be used, improved and enjoyed, only for such purposes. To this extent it recognises the doctrines of the statute of Eliz. for charitable uses, under which, it is well known, that such uses would be upheld, although there was no specific trustee or grantee." In the case of the town of Paulet, they laid down the principle, that they considered appropriations or dedications of property to particular or religious uses as an exception to the general rule, requiring a particular grantee, and like the dedication of a highway to the public. 9 Cranch 331; S. P. 2 Pet. 583. In *M'Connell* v. *Lexington*, they considered that the immemorial use of a spring, by the people of the town, as public property, was evidence of its original dedication, and decisive against a private claim to its exclusive use. 12 Wheat. 582. In *Cincinnati* v. *White*, the principle of these cases was affirmed to its fullest extent, and the court add what is very important in the consideration of this case—that "the case of *Beatty* v. *Kurtz* did not turn on the bill of rights of Maryland or the statute of Eliz., but rested on more general principles of law." 6 Pet. 436, 7.

To trace these principles to their source in the early statutes and common law of England, is therefore in perfect accordance with the decisions of the tribunal to whose revision our opinion is subject; it is the more necessary in this case, as the general course of the law of England, as to the transmission and enjoyment of property, formed the law of the colony at its first settlement, and continued in force till repealed or altered by colonial authority. In ascertaining what these general principles are, it is our duty to adopt the rules of construction which have been established by the supreme court, in relation to charities, under the 43 Eliz., and to apply them to the laws and constitution of this state, and the other English statutes, which are analogous in their provisions and subject matter to that statute, in doing which we shall start upon premises which must lead to correct results.

[Magill v. Brown.]

The legislation of Pennsylvania will be first considered according to the rules of expounding statutes laid down in the *Baptist Association* v. *Hart*, and those which are the principles of the common law.

It is not to be denied, that if any gifts are enumerated in this statute which were not previously valid, or for which no previous remedy existed, the statute makes them valid and furnishes a remedy. That there were such gifts, and that the statute has given them validity, has been repeatedly determined : the books are full of cases where conveyances to charitable uses which were void by the statutes of mortmain, or were in other respects so defective, that on general principles nothing passed, have been sustained under this statute. If this statute restores to its original capacity a conveyance rendered void by an act of the legislature, it will, of course, operate with equal effect on any legal objection to the gift which originates in any other manner, and which a statute can remove. The authorities to this point are numerous : 4 Wheat. 31 ; 1 Sugd. Pow. 267 ; 4 Vin. Abr. 479, 483 ; Gilb. Rep. 45 ; 1 P. Wms. 248 ; 3 Pet. 141 ; 4 Ch. Rep. 40.

" Statutes providing remedy for the maintenance of religion, the advancement of learning, and the relief of the poor, shall be extended according to equity, right and reason in their favour, and never against them," or be so construed as to permit the mischief to remain and suppress the remedy—the duty of judges is to advance the remedy and suppress the mischief—to advance the public and suppress the private object. 11 Co. Rep. 70 to 73 b.; Hob. 97, 157 ; 5 Co. Rep. 14 b. Statutes authorizing gifts in mortmain, and all laws in favour of public institutions, shall be favourably and benignly construed. 11 Co. Rep. 76 a.; Hob. 122 ; Co. Litt. 99 a.; 9 Cranch 331 ; 3 Pet. 140, 480 ; 1 Lev. 66 ; Dyer 225. So of charters of the king for pious and charitable works ; 10 Co. Rep. 28 a. And in all acts for the confirmation of grants by persons having power over the land, the deed shall be established though it wants some circumstance necessary to give it effect, according to its tenor and purport. 11 Co. Rep. 78 a.

The statutes of superstition were intended to advance and continue good and charitable uses, and affect none which are not derived out of superstitious uses, or to be distributed by superstitious persons. Moore 129, pl. 277 ; 4 Co. Rep. 105, 11, 13, 14 ; where the same deed contains a disposition partly superstitious, and pious and charitable in other parts, the latter are good, if not dependent on, and capable of being separated from the former. 4 Co. Rep. 104 to 116, and cases cited ; Anders. 95 to 100 ; Cro. Eliz. 449 ; Wing. Max. 497 ; Co. Litt. 342 a. Though hospitals are named in the statutes, they apply only to such as are religious or ecclesiastical, or the funds are to be devoted to purposes of superstition as specially defined and plainly prohibited : it shall not be made superstitious by construction or intendment—it must be plain and not imaginary, and no general words shall take away good and charitable gifts allowed by parliament, which are favoured in the law. Co. Litt. 342 a.; Hob. 120–4 ; Moore 865, pl. 1194 ; 11 Co. Rep. 70 b., 71 a.; Wing. Max. 497. An affirmative statute does not take away a right existing by common law or custom, as the statute of wills, which did not affect the previous right to devise. Co. Litt. 111 b., 115 a.; 3 Co. Rep. 35 a.

A custom saved and preserved by a statute is good against a statute : thus lands can be held in mortmain in London without license, because there is

[ Magill *v.* Brown. ]

such a custom; Croke Eliz. 455, and the customs of London are saved by acts of parliament and Magna Charta. 2 Co. Inst. 201; 4 Co. Inst. 250, 3; 5 Day's Com. Dig. 20; Croke Eliz. 248, 455; W. Jones, 251, 387. A statute authorizing an act to be done, repeals a law prohibiting it; otherwise it would be a dead letter, in opposition to an established maxim that such construction shall be made of all acts, *ut res majis valeat, quam pereat,* and reverse another unquestioned one, *leges posteriores priores contraria abrogant.* 6 Pet. 299. A grant by the king or an act of parliament, is an authority to hold the thing granted, and operates as a license dispensing with the performance of any other act required by any law against which the king may grant a license or dispensation; though none is given in terms, it *per se* creates an incorporation, confers succession, and grants a rent; so if done by a private person under the authority of an act of parliament, as the erection of an hospital. 10 Co. Rep. 30, 25 a.; Plowd. 502. A clause of *non obstante statuto,* is not necessary to save a forfeiture by the statutes of mortmain; it is inferred from the act of the king or the legislature in order to give it effect; 8 Co. Rep. 56: its only use is to show the king is not deceived; 4 Co. Rep. 36 a. Hence, it has always been held that the statutes did not apply to grants made by the king. 15 Vin. Abr. 479, A. 2. "He shall not be intended to be misconusant, and when he licenses expressly to alien to an abbot, &c., which is in mortmain, he need not make any *non obstante* of the statute of mortmain, for it is apparent to be granted in mortmain," the license of the king or mediate lords "operates to two intents, as a dispensation from the statute of *quia emptores,* and of mortmain, because their deeds shall be taken most strongly against them, and the king shall not be presumed to make a void grant." Co. Litt. 98 b., 99 a.; Plowd. 502; 8 Co. Rep. 56.

Where land is held immediately of the king, he may grant a license to alien in mortmain; if held mediately, it might be made by the mesne lord or with his consent; 34 Ed. I., ch. 3, Keb. St. 71; Ruff. St. 155. Since the 7 & 8 Will. III. he can do it without their consent. 2 Day's Com. Dig. 298. As tenures in chivalry had been abolished by the statute 12 Car. II. the forfeiture accruing by alienation in mortmain, accrued only to the king, who may renounce by his license a right conferred on the crown. Co. Litt. 98, 99; Vaugh. 332.

The effect of a license in mortmain is not to give a capacity to a corporation to take or hold in mortmain. Conveyances in mortmain were good at common law. Co. Litt. 98–9; Vaugh. 356. A grant in frankalmoigne placed the lands in the hands of bodies which never died; the estate became dead as to the king, or mesne lords of whom they were holden; yielding neither escheats, wardships, reliefs or other benefits; such grants were always good by deeds of private persons before the statutes, or by title of prescription, and are now good by the grant of the king. Litt. § 141, 2; Co. Litt. 98, 9; Co. Litt. 2 b.; Terms of the Law, 294; Plowd. 293; 6 Co. Rep. 17 a. Notwithstanding the statutes, the estate vests by the conveyance, 7 S. & R. 320; they are founded on the capacity of the grantee to take, so that wherever they apply the conveyance would enable a corporation to hold at common law for its own use; for if the estate did not vest, it would remain in the hands of the grantor or his heirs, as in the case of a conveyance to super-

[ Magill *v.* Brown. ]

stitious uses, which are merely void without incurring any forfeiture, by the statutes of Hen. VIII. and Ed. VI.

The license therefore is only an exemption from the penalty of the statutes, Co. Litt. 52 b.; it restores an interest; 1 Freem. 117. It is an authority coupled with an interest, enabling the grantees to acquire and enjoy an inheritance to their own use, without incurring the forfeiture, and by a renunciation of the rights given by the statutes, leaves the estate in their hands as if they had never been passed. 2 Day's Com. Dig. 297, b. 3; F. N. B. 222, 495, 500; 4 Co. Inst. 135; Co. Litt. 99 a.; Vaugh. 333, 356; and operates in favour of a society or body not incorporated by a charter, Vaugh. 351, 2; 7 Co. Rep. 35 b.; which is conclusive to show its previous capacity to take. All that can be required then, to give the same capacity to hold as to take, and make the right to enjoy as perfect as to take an estate, is any act of the party to whom the forfeiture accrues, which is in terms, or by its legal operation, a renunciation of a right conferred by law, which binds him and protects the estate from the assertion of his claim under the statutes; according to the established principle, that subsequent laws abrogate prior ones inconsistent with them, without any repealing clause, and will produce the same effect as a license in mortmain.

It is admitted that the king is bound by all acts of parliament in which he is named, so that he can exercise no power by statute, prerogative or tenure, in derogation of any right protected, or authority conferred by the statute: but, generally speaking, he is not bound unless its provisions extend to him, subject to these exceptions; all statutes which provide profitable remedy for the maintenance of religion, the advancement of good literature, and the relief of the poor, 11 Co. Rep. 71 b.; 5 Co. Rep. 14 a. b.; which suppress wrong and provide a remedy for a right, 2 Co. Inst. 142, 69, 359, 681; or tend to perform the will of a donor or founder, 11 Co. Rep. 72 a.; 5 Co. Rep. 14, 15; Plowd. 246; 3 Atk. 147, bind the king though not named. His claims to lands by escheat, forfeiture or wardship, are subject to all rights existing before they came to his hands; the law gives him a better remedy, but no better right, than the subject from whom the land came to his hands, 2 Co. Inst. 573; 2 Ves. Sen. 296, 7; Hardr. 69, 469; and the appropriate courts were authorized by the statute 33 Hen. VIII. ch. 39; Keb. St. 555; 2 Ruff. St. 324, to decide on the rights of a subject, in a controversy between him and the king, according to equity and good conscience, as between subject and subject; 7 Co. Rep. 19 b.; Hardr. 27, 176, 230, 502; 4 Co. Inst. 190.

These are the principles which have given to the 43 Eliz. its powerful effect; though it contains no repealing clause, license or *non obstante statuto*, yet, by universal consent, it has been held to repeal the statutes of mortmain, the exception of corporations in the statute of wills, and to restore the common law in all cases embraced in its provisions, or which can be brought within them by the most liberal and benign construction. 1 P. Wms. 248; Pr. Ch. 16; Gilb. Eq. 137; 2 Eq. Cas. Abr. 191; 3 Pet. 141.

These principles are admirably condensed by the supreme court in 4 Wheat. 31, and are those by which we must consider the legislation of Pennsylvania on the same subjects; we must hold its law to bind the state, and to dispense with the forfeiture accruing to it by an alienation in mortmain, if a similar law in England would bind the king. The prerogative of a repub-

[ Magill *v.* Brown. ]

lican state cannot be deemed, in a court of justice, more sacred than the jewels of a crown; or the rights of its citizens, individually or collectively, to the enjoyment of property, to be placed on a less permanent foundation than those of the subjects of a monarchy; nor can corporations be subject to disabilities here from which they are exempted by the general course of the law of England, between the spirit and policy of which, and that of Pennsylvania, there will be found a most marked difference in this respect.

In England, there has always been a jealousy of their rights to hold property; here, they will be found to have been favoured and protected by express provisions in the constitution and laws, while there is an entire absence of any restriction on their capacity to take or enjoy estates; there, the effect of statutes has been to remove disabilities interposed by former statutes, which abrogated common law rights; here, laws have been passed in affirmance of its principles, and they have been embodied in a supreme law. There, courts have gone to the extent of their power, to rescue charities from the intolerant spirit of the times; here, their duty is to further the benevolent policy of the people and legislature as evidenced in all their acts.

From the first settlement of the province, we find that the uniform tenor of its laws has been, to encourage all alienations of property, and to confirm its disposition, in every mode known to the law. The act of 1705 confirmed all sales of land made under the laws of the province, and declared that no deed, grant or assurance should be held defective on account of any want of form, of livery of seisin, attornment, misnomer or misrecital, but shall be good and effectual. 1 Dall. Laws, 51, 3; 1 Smith, 31. This law has always been in force. The act of 1711, confirmed all grants from the proprietor to any person or persons, bodies politic or corporate, to hold the same for such estates and uses as they had .been sold or disposed of, notwithstanding any defects therein, and shall be expounded most beneficially for the grantees, according to the words, tenor and true meaning thereof. 1 Dall. App. 39, 40. This law was repealed in council in 1713, but its principles have ever been respected. The law of 1705 declared, that all wills whereby any lands were devised, should be good and available in law for granting, conveying, and assuring the lands devised and chattels bequeathed. 1 Dall. 53; 1 Smith 33; 1 Dall. App. 26, 36. The law of 1742 gives a remedy for the recovery " of any legacy or bequest of any sum of money" to any person or persons. Miller's Laws, 156; 1 Dall. 449, 631. Neither of these laws contain any exception of corporations.

The rights of conscience were declared inviolable by the charter of privileges of 1701, granted by William Penn to the people of the colony: no person who lived quietly under the government and acknowledged one God, should be in any case molested, or prejudiced in his estate, because of his conscientious persuasion; 1 Dall. App. 8, 10; and liberty of conscience was secured by a law approved in council. 1 Dall. 43, 4. In 1712, an act was passed empowering all religious societies of protestants within the province, to purchase and hold lands for burying grounds, houses of worship, schools and hospitals; and, by trustees or otherwise, as they shall think fit, to receive and take grants and conveyances for the same, for any estate whatever for the uses aforesaid. All sales, gifts or grants to such societies, or any persons in trust for them, were ratified and confirmed according to their

[ Magill *v.* Brown. ]

tenor and meaning, and of the parties concerned. Gifts to the poor of these societies, or for their use, shall be employed only for the charitable uses for which they were given, according to what may be collected to be the true meaning of the donors or grantors, notwithstanding any failure in these gifts, grants or bequests. Bradford's Laws, 160. This law was repealed in council, twice enacted, and as often repealed. In 1710, the judges of the county court were made a court of equity, authorized to proceed according to the rules and practice of the high court of chancery of Great Britain, and an appeal was given to the supreme court, with power to decree as may be agreeable to equity and justice; Bradf. Laws, 103, 120. Though this law was repealed in 1713, and courts of chancery discontinued in 1736, the rules and principles of equity have always formed part of the common law of the state.

The sixth article of the charter to Penn provided, that the laws for regulating and governing property within the province, as well as for the descent and enjoyment of lands and goods and chattels, should be and continue the same as they should be for the time being, by the general course of the law of England, till the same should be altered. 1 Dall. App. 3. The preamble to the act of 1718 recites, that it is a settled point, that as the common law is the birth-right of English subjects, so it ought to be the rule in British colonies. But acts of parliament have been adjudged not to extend to these plantations, unless they are particularly named in such acts; 1 Dall. Laws, 129, 133; or, as has often been declared by the supreme court of the state, unless they are convenient, adapted to the circumstances of the colony, or have been in force by adoption, usage or long-continued practice, in courts of justice. 1 Dall. Rep. 67, 74; 3 Binn. 596–7; 1 Dall. Laws, 722.

After repeated attempts to pass a law in favour of religious societies which would accord with the spirit of the colony, one was finally approved in council. The act of 1730–1 confirmed all sales, gifts and grants of land to any persons in trust for the use of any protestant religious society, for sites of churches, houses of religious worship, schools, almshouses and buryinggrounds, made before the law; it also contained a provision which made it lawful in future, for any such society within the province to purchase, take, receive by gift, grant or otherwise, for the above specified uses and purposes, and for any estate whatsoever, and to hold the same for the said uses in fee, provided, that they should not take land for their maintenance or support, or for any other uses than those specified. 1 Dall. Laws, 270–3.

The constitution of 1776 declared, in the first section of the bill of rights, "That all men have an equal right to acquire, possess and protect property;" and in the eighth, "That every member of society hath a right to be protected in the enjoyment of life, liberty and property." 2. "That all men have a natural and unalienable right to worship God according to the dictates of their own conscience and understanding." 3. "Nor can any man, who acknowledges the being of a God, be justly deprived or abridged of his civil rights as a citizen, on account of his religious sentiments, or peculiar mode of religious worship, and that no authority is or ought to be vested in any power whatever, that shall in any case interfere with, or in any manner control the rights of conscience in the free exercise of religious worship."

In the frame of government, § 45, "And all religious societies or bodies of

Y

[ Magill *v.* Brown. ]

m en, heretofore united or incorporated for the advancement of religion or learning, or for other pious and charitable purposes, shall be encouraged and protected in the enjoyment of the privileges, immunities and estates which they were accustomed to enjoy, or could of right have enjoyed under the laws or former constitution of the state." § 46. "The declaration of rights is hereby declared to be a part of the constitution of this commonwealth, and ought never to be violated on any pretence whatever." 1 Dall. App. 55, 60; Convention of Pennsylvania, 55, 64.

The first law passed, on the change of government, declared the province laws in force till altered or repealed; also the common law, and such parts of the statute laws of England as had been before in force,—"And so much of any law or act of assembly as declares, orders, directs or commands any matter or thing repugnant to, or inconsistent with, the constitution, is hereby declared not to be revived, but shall be null and void, and of no force or effect." 1 Dall. Laws, 722.

The constitution of 1790, in art. 7, § 1, provides, "That the legislature shall, as soon as may be, provide by law for the establishment of schools throughout the state, in such manner that the poor may be taught gratis." § 2. "The arts and sciences shall be promoted in one or more seminaries of learning." The 44th section of the old constitution contained similar provisions, though not so full. § 3. "The rights, privileges, immunities and estates of religious societies and bodies corporate, shall remain as if the constitution of the state had not been altered or amended." The first three sections of the bill of rights are, in substance, the same as in the old one. The third concludes—"and that no preference shall ever be given by law to any religious establishment or modes of worship." § 26. "To guard against the transgression of the high powers which we have delegated, we declare that every thing in this article is excepted out of the several powers of government, and shall for ever remain inviolate." In the first clause of the schedule it is ordained, "That all laws of this commonwealth in force at the time of making the said alterations and amendments in the said constitution, and not inconsistent therewith, and all rights, actions, prosecutions, claims and contracts, as well of individuals as of bodies politic, shall continue as if the said alterations and amendments had not been made." 3 Dall. Laws, 32, 36. These provisions, and the law which immediately followed the adoption of the constitution, are a direct negative on the existence of any spirit of policy adverse to corporations.

In 1791, an act was passed "to confer on certain associations of the citizens of this commonwealth, the powers and immunities of corporations, or bodies politic in law." The preamble recites the reasons to be, the saving time to the legislature in enacting laws to incorporate private associations, and the convenience of individuals desirous of incorporation—and the law provides: "That when any number of persons, citizens of the state, are associated, or mean to associate for any literary, charitable or religious purpose, they are empowered to obtain a charter of incorporation, subject only to the following conditions. To state in writing the objects, articles and conditions of their association, and if the attorney general and the supreme court shall certify their opinion that they are lawful, the governor shall order

[ Magill *v.* Brown. ]

it to be enrolled; and the persons associated become an incorporated body in law and in fact; to have continuance by their corporate name and title. They are authorized to execute the usual corporate powers, and to make by-laws and ordinances, provided they are not repugnant to the constitution and laws of the United States, of this state, or to the instrument on which the corporation was established. The corporation and their successors shall be able and capable in law, according to the terms and conditions of the instrument on which they were established, to take and hold lands, money, goods and chattels given them, according to the articles and by-laws, or the will of the donor, provided the clear income does not exceed five hundred pounds yearly." "And, whereas, bequests and legacies may be made to public institutions of which they may not derive the benefit intended, from a want of information," it is directed, that "when a will is brought to the register's office, to be recorded, which shall contain a bequest or legacy to a public incorporate body, he shall give them notice within six months, of the nature and amount of the legacy, and the name of the executor." 3 Dall. 40, 43.

The law of 1818 enacts, that where any lands are holden in trust for any religious society, or for any number of persons for the purpose of public worship or schools, or to be used as a burying-ground, or for charitable purposes; or where any estate of a personal nature, is or may be vested in any person or persons, to be applied by them to any religious, literary or charitable use or uses, and the trustee or trustees neglect or abuse such trust or trusts, the supreme court, or court of common pleas, on complaint made, may call on the trustees to answer; and if, on hearing, the court are satisfied that the trust has been neglected or abused, may and shall remove the trustees, and appoint others in their place, who shall be vested with the rights and powers of the former trustees, and give such security as is required. § 2. The court shall have the power and jurisdiction of compelling the trustees to account before the court or auditors. Purd. 167; 7 Smith 43–4.

This law was followed by the act of 1825, "To prevent the failure of trusts." The supreme court is authorized to grant relief in equity in all cases of trusts, so far as regards the appointment of trustees, either in consequence of the death, infancy, lunacy or other inability, or where a trustee renounces or refuses to act, or one or more dies, or becomes *non compos*, and a joint action is requisite, and to compel a conveyance of the legal estate, when the trust has expired. On the application of any person interested in the execution of the trust, the court may appoint a trustee, having regard to the objects of the trust as fully as a court of equity can do, and the rights of the former trustee shall vest in him; on the application of trustees, the court may remove them and appoint others. The act of 1828 confers the same powers on the courts of common pleas, district and circuit courts. Purd. 858–60.

From this summary of the legislation of Pennsylvania, it appears to have partaken of the spirit of its successive constitutions, and to have been constantly progressive, in the completion and perfection of the great system of its founder, each succeeding law being more liberal in its principles, and more expanded in its provisions. The principles of the charter of Penn continued in force and protected all religious societies in the enjoyment of their

[ Magill *v.* Brown. ]

rights of worship and property, in their houses of devotion, after the repeal of the act of 1712 by the council, and the passage of the act of 1730, as before.

In 1733–4, Governor Gordon informed the council that a house had been erected in Walnut street for the exercise of the Roman Catholic religion, in which mass was openly celebrated, contrary to the laws of England, particularly to the statute of 12 Will. III., which extended to the colonies. The council were of a different opinion, and declared that the catholics were protected by the charter of privileges and the law concerning liberty of conscience; but they referred the subject to the governor, that he might consult his superiors at home. No other proceedings however took place. Gord. 216. ·This opinion of the council accords with the declaration of William Penn to the members of the assembly, in 1701, " That he had justly given privileges the precedency of property as the bulwark to secure the other;" 2 Clarkson's Life of Penn, 203: it was a rule of property, and the basis of the usage and common law of the state; the opinion of the council was the practical exposition of the charter, as understood and acknowledged, of which there cannot be a stronger case than the one that occurred. The 11 & 12 Will. III., ch. 4, prohibited the celebration of mass in any of the dominions of England, under a penalty of perpetual imprisonment. 4 Ruff. St. 41. If this statute included the colonies, it was repealed by the charter; if it did not, there was no law professing or attempting to interfere with it as a fundamental law of the colony.

The list of laws rejected by the king in council, shows the constant struggle between the policy of the colony and mother country; Hall and Sellers' L. 21, 57, 67, 99, 125, 193, 199, 276; Miller's L. 16, 74, 158; which ended only with the revolution. The usage continued, in despite of the efforts of the king and council to prevent it from having the sanction of a law, and the provisions of the constitution were as broad as the usage: its phraseology is adapted to the inconveniences which existed, and its provisions afford a remedy commensurate with the mischief arising from the want of a legal sanction to rights indispensable to the enjoyment of practical liberty of conscience, as a bulwark to property.

In the case of the Cedar Spring congregation, the trust did not depend on the enabling provisions of the statute, but on the custom of the province, as stated in *Witman* v. *Lex; Methodist Church* v. *Remington;* 6 Binn. 59, &c. The evidence of this custom appears in all the acts for granting charters, and in the law of 1791, in relation to the lots held by the quaker societies in Front street, and at the corner of Fourth and Arch streets. 3 Dall. L. 46–7. The proceeding before the council in 1734, is unequivocal evidence of the claim of right by the catholic societies, according to the usage under the charter of 1701; so that we have from the most authentic sources, full evidence of the existence of a custom and usage, expressly saved and preserved by the constitution of 1776, which operates not only prospectively, but refers by express terms to the former constitution of 1701, so as to make the usage of the same force from that time, as it would have had, if the state had been then independent of the mother country, as she was in 1776. Being saved by the supreme law, the custom had the same force as the law itself, and stood on the same basis as customs saved by Magna Charta, according to the rules of law before laid down.

[Magill *v.* Brown.]

The constitution of 1776, then, puts the rights which could be enjoyed by the previous custom of the province, on the same footing as if they had been defined in detail in the 45th section, and the present constitution makes them perpetual. If any additional sanction could be given to them by human authority, it will be found in the first amendment to the constitution of the United States. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." This extends to the judicial as well as legislative departments of the government, and annuls all jurisdiction over the subject matter, past or future; 1 Cranch 174-9; 3 Dall. 382. If the rights of a religious or literary society are derived from a contract or grant, no state law can impair their obligation, and the supreme court have placed them under the same constitutional protection as those of individuals; 9 Cranch 45; 9 Wheat. 454; 8 Wheat. 480; 4 Wheat. 624.

To deny to bodies united without a charter, any rights of property which could be enjoyed by a corporate body, would be in direct opposition to both the constitutions of the state and union, and the custom of the province. "Incorporations were almost unknown; yet to all sorts of pious and charitable associations, in every part of the province, valuable bequests were made by those who were ignorant of the niceties of expression necessary to accomplish the object at common law. Nothing was more frequent than bequests to unincorporated congregations, without the intervention of trustees; and even when there was a corporation, it frequently happened that the corporate designation was mistaken, or the trust vaguely defined. Notwithstanding which, the testator's bounty was uniformly applied to the object." Surely a usage of such early origin and extensive application, may claim the sanction of a law, resting, as it does on the basis of all our laws of domestic origin, the legislation of common consent. 17 S. & R. 91-2.

The same principle is adopted in all governments; a usage or custom is presumed to have had its origin in a law once in existence, and lost in the lapse of time, the evidence whereof being by prescription, that supplies the place of the written law, which is taken to have been as broad as the usage. The law presumed from a custom, has the same force as one appearing on the rolls of Parliament—the only difference is in the mode of proof; and the rule that a custom shall not prevail against an act of parliament, unless it is saved and preserved by a statute; 3 Dow Parl. Cas. 112; Anstruther, 614; 1 Dow Parl. Cas. 322. The supreme law of England and the states of this union, which have no written constitutions of government, is proved only by legislative usage, which is the evidence of their constitution and supreme law; 3 Dall. 400; 2 Pet. 656-7; 6 Pet. 714-15. On whatever subject a known and recognised usage exists, it forms the law of the case, and controls all affirmative statutes, and the rules of the common law—as a general or local law, according to its nature; 6 Pet. 715, and cases cited; the reason is obvious—it is founded on a law presumed from the prescription. This presumption is not, that such a law ever, in fact, existed, but "it is adopted as a general principle, to take the place of individual or specific belief;" 12 Ves. 265-6; 10 Johns. Rep. 380; 6 Wheat. 504.

Though the party claiming by prescription produces his title, and it is worth nothing, the court will direct the jury to presume another grant subse-

quently; all shall be presumed to be done, which shall make the ancient appropriation good, and the right shall be presumed from the prescription, if it could have had a legal beginning; 12 Co. Rep. 5; Cowp. 109, 110; the same rule applies to the franchises of a corporation; 4 Mod. 55; 1 Saund. 345; 1 Roll. Abr. 512; "for whatever may commence by grant, is good by prescription." Where possession has been long held under a claim of right, to the exclusive enjoyment of the lands of the crown, a patent, charter, or grant of the king will be presumed; 1 Dow P. C. 322; the same rule is applied in this country, (14 Mass. 534,) though the possession was taken and held under a defective title; 4 Pet. 506, 507; 5 Pet. 439, 440. The principle has been applied in Pennsylvania to a religious society, which had been long in possession of a piece of ground, on which they had erected a church, used it for public worship, and occupied an adjoining piece for a burial ground, and another piece for the free passage of the congregation, and the accommodation of horses and carriages, according to what the supreme court declared the common usage. This possession was held to be sufficient to enable the society "to recover in ejectment, and sufficient for a presumption, that the commonwealth had granted the land to the predecessors of the plaintiffs, or made a promise of a grant which would establish a right of pre-emption;" *Mather* v. *The Ministers of the Trinity Church and others,* 3 S. & R. 510, 511.

Either presumption is sufficient for all the purposes of this case; the only difference between a grant and a pre-emption is, the payment of the purchase money, which must precede the formal consummation by patent; but when paid, the right to a patent, and the enjoyment of the estate against the commonwealth, is complete. We may now assume these principles to be settled, that usage and customs have the force of laws—that those which are saved and preserved by the constitution of this state, are its supreme law—and that rights declared in the constitution, or which have been, or could be enjoyed according to customs or usage, saved and preserved, neither depend on legislative discretion, nor can be impaired, much less forfeited, by legislative power. It follows, that no charter can be requisite to give a capacity already existing by usage, or asserted in the bill of rights or constitution, or a dispensation from a forfeiture, which no law was competent to enforce or prescribe. Hence, the course of the legislature has been, in granting special acts of incorporation to religious, literary and charitable societies, strictly in the spirit of the constitution, to superadd to their constitutional rights, the privileges, franchises and immunities of corporations, to confer the powers of corporate bodies, "to further their objects and charitable designs," to put all religious societies on the same footing, as to the encouragement and protection afforded by the constitution; Bradf. L. 11, 23, 52, 89; Laws of 1790, p. 285; by imparting to them such powers, as would enable them to manage their corporate concerns, and enjoy their corporate property by their own by-laws and officers, and to assert their rights in their corporate capacity; not to give the capacity to take property, nor to release it from the forfeiture of mortmain. Charters were given to catholic societies, "to enable them to manage the temporalities of the church, as fully as any other religious society could do;" Laws of 1789, pp. 456, 532; 9 Cranch 49, 326–7. A lottery was granted for the benefit of the Hebrew congregation, in order to save their property from sale by exe-

[ Magill *v.* Brown. ]

cution,—the preamble contained this recital—"And whereas, it is just and proper that all religious societies should be protected, so far as is consistent with the principles of the constitution;" Laws of 1790, p. 310; 2 Dall. L. 817.

In most of the laws granting charters, there is a recital to this effect, "that it is just and right, agreeably to the true spirit of the constitution, that the prayer be granted;" or, "that this house is disposed to exercise their powers for the encouragement of all pious and charitable uses;" Bradf. L. 37, 223, 407; Laws of 1789, pp. 189, 198, 225, 285. They are retrospective to the property held by the society, before the incorporation, in some cases by deeds in trust for their use, in others, to the society by their name of association only, of which there are more than thirty instances in Bradford's laws, which fully establish the fact of the universal usage throughout the state, for all religious societies to enjoy estates without actual incorporation.

What expresses the sense of the legislature most unequivocally is, the law of 1789, which, after reciting the 45th section of the constitution, declared so much of the law of 1779, relating to the college and charitable school of Philadelphia, as was repugnant to the charter from the proprietor, to be void, on the ground, "that the charter gave them rights which were entitled to encouragement and protection in the free enjoyment and exercise thereof, in conformity to the will of the donor, in the same manner as it could have of right occupied and enjoyed the same under the former laws and constitution," and that the law was "repugnant to justice, a violation of the constitution, and dangerous in its precedent to all incorporated bodies, and the rights and franchises thereof;" 2 Dall. L. 650, 651.

When such is the effect of the constitution, it certainly could not be the law of the state, that bodies united or incorporated, needed any other protection for their rights, privileges or estates. They could be submitted to no other test than usage; and though the legislature could not be coerced to grant an incorporation, they could not infringe any right which could be enjoyed under the constitution. They might refuse them the franchises necessary to transmit property by mere succession, and to govern the society by corporate officers and by-laws; but as all the individual members were capable in law of acquiring it, no power could take it from them.

The inhabitants of a town may take in succession by a grant to their singular heirs, a private person may build and endow a house for a school, an hospital, a church, or abiding houses for the poor, without incorporation; but he could not, by his own grant, give it the corporate franchise of succession; 10 Co. Rep. 26, 27; 2 Co. Inst. 202; 9 Cranch 329. The rule of the common law is recognised and well illustrated in the preamble to the 39 Eliz. ch. 5, for the erection of hospitals, &c., by private persons,—the reason for which is declared to be, "understanding and finding that such good law has not taken such good effect as was intended, by reason that no person can erect or incorporate any hospital," &c., "but her majesty, or by her highness' special license, by letters patent in that behalf to be obtained." The act then authorized the creation of incorporations by the deed of the founder enrolled in chancery, without any act of the crown, with full corporate powers and franchises, and to make any by-laws not repugnant to the laws of the kingdom. Keb. St. 921; 2 Ruff. St. 687, 688. This statute was evidently the pattern

[Magill *v.* Brown.]

for the act of 1791, as appears by the title, the preamble, and the enacting clauses. Neither contain any restrictions on any unincorporated societies or bodies: their provisions are remedial, in order to facilitate the enjoyment of charitable donations, and the furtherance of charitable objects, by corporate franchises; to enable an individual to do what he could not do without a law;—to give a private deed the effect of a public grant, in order to complete the pious and charitable work by the charter of the donor or founder, without a special application to the crown or assembly; 10 Co. Rep. 25–34; 9 Cranch, 49. Both laws are founded on an existing right to make the donation; and if the right of property had not been understood to have been fixed and settled, the legislature would never have interfered to secure its enjoyment in perpetuity by succession, as a continuing corporate franchise with no other limitation to the power of making by-laws, than the laws of the land, the will of the donor or founder, and the articles of association; placing the incorporation on the authority of parliament, in England, and in this state making it a contract or legislative grant, the obligation of which cannot be impaired by the state.

All the analogous legislation of England is bottomed on the right of private persons, singly or associated, to take and hold estates of inheritance by apt words of grant to themselves and their heirs, which is a common law right of all subjects who are under no legal incapacity. In this respect the law of both countries is the same; the only difference between them consists in two particulars:—1. In England, those persons who have devoted themselves to religion, withdrawn from the world, and entered into holy orders, are not deemed in law to have any civil existence until they have acquired the capacity of natural persons by the removal of the disabilities arising from their profession and the restoration of their original right. In this state, there is no such disability; the bill of rights declares it to be the natural and inherent right of all men to acquire, possess and enjoy property, and the constitution protects all members of society in their persons and estates; no common law disability, therefore, can obstruct the vesting of a constitutional right, and as no law can take it away, no charter is necessary to confer it, or to restore what has not been relinquished or lost. 2. In England, there are statutory disabilities on corporations, whereby they are less favoured than individuals or bodies not incorporated; but, in this state, they are subject to no restraints, and in the constitution are placed on the same footing of protection as private persons or bodies united without a charter—there is of course no necessity of any law to repeal a statutory disability, or of a license by any subordinate authority, to perfect a right conferred by a supreme law. If an act of parliament had contained the same provisions as the constitution of this state, and the statute of 34 & 35 Hen. VIII. had contained no exception for coporations, there could have been no doubt that any religious society could have taken an estate in fee without a charter, and enjoyed it in mortmain without a license. There can be no clearer evidence of the common law right, than the enaction of statutes to take it away, nor is any rule better established, than that an exception of a particular case is an admission that the case would have been embraced in the law or constitution, if no exception had been made. 9 Wheat. 207; 12 Wheat. 436–8.

[Magill *v.* Brown.]

The application of this rule to the jurisprudence of this state will furnish a solution of all the difficulties which have attended the investigation of the law of charities, and lead to results which cannot be erroneous. The reason of the law is the law itself, and we have only to look to the reasons which call for an incorporation in England, for the want of an act of parliament removing the disabilities of religious persons, and to bear in mind that the effect of the constitution must necessarily be that here ecclesiastics or persons in holy orders have a capacity to purchase, which is denied to them by the policy of the common law. Hence arises the necessity of an incorporation by charter or prescription, to give them the capacity of natural persons, by removing the disability arising from their being professed men of religion, as monks, friars and canons, who are deemed dead persons in law; but when one of them becomes a bishop, an abbot, &c., he is the head or sovereign of the house, having a secular capacity to purchase and hold land, through whom the monks or the convent become as natural persons, and remain so while there is a sovereign or head. A grant to an abbot and his monks, or to the abbot and convent, is good, and vests the title in perpetuity; if the grant is made while there is a vacancy in the head or sovereignty, the fee remains in abeyance, but vests whenever the vacancy is filled. Perk. §§ 3, 51, 55; Litt. §§ 443, 655; Co. Litt. 263, 346 b; 9 Cranch 47, 329; 2 Pet. 580. The reason why a grant to monks or to a convent, who have never had a head or sovereign by charter or prescription, is bad, is, "that when a man taketh lands or tenements by purchase he ought to be of ability to take the same when it falleth to him by purchase;" Perk. § 505: monks have not this capacity, because they are all dead persons in law; but the abbot, who is the sovereign, &c., and this by reason of the sovereignty, for otherwise he should be but as one of the other monks of the convent; Litt. § 655; Co. Litt. 345 b.; and the grant cannot take effect, though a corporation was made afterwards; 2 Co. Rep. 51 b.; Hob. 33; 8 Vin. Abr. 56, H.; Perk. § 3-4; Co. Litt. 2 a., 3 a.

The reason of this rule shows that it is confined to grants to persons who have no personal capacity or civil existence; it cannot apply to natural persons, who have a common law right, guarantied in this state, and declared inviolable, as to whom a charter could have no effect except to confer some corporate franchise which was not of right by law. There is no rule of the English law which requires a charter to enable a society or body of capable persons to take and hold property in fee by proper and apt words of inheritance; any opinion to the contrary must be founded on the misapplication of the foregoing rule, as is evident from the cases referred to by the counsel in the argument of the case in 4 Wheat. 1; and in not discriminating between the right of holding an estate of inheritance with and without proper words to convey it, and between the effect of a deed, which transmits from ancestor to heir, or a charter which passes it from predecessor to successor. A grant to the commonalty, parishioners, inhabitants or good men of a place, (Co. Litt. 3 a.,) the commoners of a waste, (Sheph. Touch. 236-7,) the people of the county of O., or to associates, being a settlement of Friends at S., does not enable them to hold an inheritable estate without a charter; (Perk. § 510,) if they could take any estate or privilege it would be only for the lives of the

[Magill *v.* Brown.]

then existing inhabitants, (2 Johns. Cas. 323; 9 Johns. Rep. 75,) as in case of a grant to a single person, omitting "and his heirs." They are capable of taking the fee by proper words of grant to themselves and their heirs, or to another in trust for their use; (8 Johns. Rep. 388; Sheph. Touch. 337,) but some person or body politic, must be named who can take by force of the grant as a mayor and commonalty, (Perk. § 64,) or the church-wardens of such a church, (Perk. § 55,) in ancient time, (Co. Litt, 3 a.,) and now by custom. Croke Eliz. 145, 179. The parishioners, inhabitants or good men of Dale are capable to purchase goods by such name, (Co. Litt. 3 a.;) the only reason why they cannot purchase in fee by that name is that they are not a permanent, (Hob. 86) continuing body having succession; any estate conveyed to them in fee, must descend to their singular heirs, unless they have by charter or prescription the franchise of a body politic, which is the only thing required to enable them to hold in perpetuity by succession.

These considerations lead to the object and effect of an incorporation in England, first, to give to ecclesiastical persons the same civil capacity to purchase as other natural persons have by right; and, secondly, to confer the franchise of succession. In this state, the first object is effected by the constitution, and the incorporation is necessary only for the second; the only difficulty then is to distinguish between the natural rights of all the members of the society which constitutes the state a body politic, and those which are conferred by charter or law on a body of men who are the members of a society united for particular purposes. The common law requires no charter to enable a body of men in any place to purchase chattels or receive donations of money, a chattel interest, or an estate for the lives of the grantees, in land, by their name, as a body, without other words; if one is necessary, it can be only to give them some privilege, immunity or exemption from the rigour of the common law, so as to make them as a natural person capable of enjoying an estate in fee without words of inheritance.

A corporation is a permanent thing, that may have succession, an assembly of many into one body, (Terms of Law, 123,) an artificial body constituted of several members, united by its franchises and liberties, which form its ligaments and are its frame and essence, (Lilly's Pr. Reg. 459,) which never dies, and exists only in its political capacity, (1 Bl. Com. 468-70,) which unites and knits them together as a natural person, (Ib. 272;) or a person who is made by policy and fiction of law, a body politic, with the capacity of succession in perpetuity, but which exists in both a natural and political capacity; Wood. Inst. 109; 1 Bl. Com. 468-70. The corporation aggregate which never dies and can take only in one capacity, holds in perpetuity by a grant to itself without words of succession; but a corporation sole existing in both capacities, takes only for life, unless the word successors is added, so as to denote the intention to convey to him in his politic capacity of succession; Co. Litt. 8, 9, 94 a., 96 b., 250; Perk. § 240; Plowd. 496; Wood Inst. 111; Terms of Law, 124; Croke Jac. 532. Succession is a corporate franchise, by which property passes from predecessor to successor, as it does from ancestor to heir, by inheritance; Terms of Law, 123; 4 Co. Rep. 65 a.; succession is not a word of inheritance; a grant to a private person and his succes-

[ Magill *v.* Brown. ]

sors, carries only a life estate; succession must be granted by a charter from the crown, or a law making the grantees a corporation, so that their rights devolve on their successors by virtue of the franchise.

The object and effect of the incorporation is to create the artificial person with the same capacity as the natural person; whenever it exists as a perpetual body, in the exercise of this franchise, its uninterrupted enjoyment is evidence of a charter presumed to be lost, and it is a corporation in fact and in law; Perk. § 34; Co. Litt. 132 b.; 2 Day's Com. Dig. 300; 1 Saund. 345; 1 Mod. 55. The word successors is not in all cases indispensable to vest an interest by a grant or an obligation in the successor of a sole corporation; as where a grant is made to an abbot and his convent, to hold in frankalmoigne, the tenure imports succession, and as the celebration of divine service, and free alms are continuing objects, the estate is in perpetuity, as in case of a gift in frank marriage; Litt. § 133; Co. Litt. 93 b., 94 a.; S. P. 3 Pet. 146–7. So where, by a local custom, the right passes to the successor, though not named, as the chamberlains of London; Terms of Law, 124; 1 Lilly Pr. Reg. 383–4; 4 Co. Rep. 65 a.; Croke Eliz. 464, 682; Hob. 247; 5 Day's Com. Dig. 17; so, of church-wardens who are a corporation by prescription throughout the kingdom, with capacity to take and hold money and chattels for the church, but not lands, yet they may hold lands by special custom in succession as a corporation; March, 67, pl. 104; Croke Eliz. 145, 179; Croke Jac. 532; Croke Car. 455; 9 Cranch 45, 53, 328; 17 S. & R. 92.

Neither are any particular words necessary to create the corporation; a public grant of corporate privileges is, *per se*, an incorporation to give the capacity of enjoyment according to the grant; as to the inhabitants of a town, to have *guildam mercatoriam*, which unites them by the franchise, and makes them as a natural person for the purpose; 10 Co. Rep. 30 a.; 1 Roll. Abr. 513; 1 Bl. Com. 474. And as the only thing for which a charter is necessary is, to grant the franchise of succession, its actual enjoyment and exercise is, *per se*, evidence that it was by lawful and competent authority; 1 Bac. Abr. 500; 10 Co. Rep. 28 a.; 1 Bl. Com. 475–9; 1 Lill. Pr. Reg. 459. London itself is only a corporation by prescription; 5 Day's Com. Dig. 17, H.

If then the religious, literary and charitable societies which have existed in this state had no other foundation for their rights of property, than the principles of the common law and long usage, they could not be disturbed for want of an actual incorporation by charter or law; and when we add to these rights, those expressly secured to them by the constitutions of the state and union, we cannot doubt that they are as inviolable as a charter could make them. To decide that one was necessary to enable a religious society to enjoy the sites and buildings for worship, for charity, for education and sepulture, and funds for the maintenance and support of poor, would be a declaration that the rights of conscience and worship could be made dependent on the discretion of the legislature. And, if a charter could be withheld from any society, united for religious purposes, so as to impair their rights of property, then a preference could be given to modes of worship; there would be a virtual prohibition of the free exercise of religion, and the sect favoured by the legislature, would be, in substance, a religious establishment.

Connecting with the whole course of the legislation of Pennsylvania, the

[ Magill *v.* Brown. ]

well known fact which appears in the record in this cause, that the societies of Quakers have never been incorporated, it is not credible, that their right to hold their places of worship and charity, and to enjoy donations of land and money, is a mere shadow, without a charter in fact. In our opinion, they have had from 1701, and yet have, a charter more firm than any patent or law can create, the great charter of Penn, which was the basis of the usage and custom of the province, and by its incorporation into the supreme law of the state, is the rule and standard of right by which our judgment must be guided. The law of 1777 repeals all laws inconsistent with its provisions, whether those of the mother country or the colony; and declares that laws not inconsistent with it shall remain in force, as well as such statutes and common law in England as have been heretofore adopted. The laws of 1705 in relation to deeds and wills, which have no exception of corporations, the law of 1730–1, which actually amortises the sites of houses of worship and burial grounds, then in possession of religious societies, devoted or erected for the purposes of religion or charity, was also a direct license to all protestant religious societies to take and hold in mortmain by future grants and gifts. The law of usage which, being saved by the constitution, became a supreme law, gave the same right to all societies united or incorporated for these purposes, whether protestant or not. As the custom of the province was in accordance with the rejected laws of 1710, in relation to the powers and duties of courts of equity, to the law of 1711, for the confirmation of public grants, and of 1712, in relation to religious societies, and the various acts concerning liberty of conscience and the privileges of freemen, and as this custom is the law of the state, according to which, lands have been held in mortmain from its first settlement, we are bound to give it the same effect as is given to the custom of London, by all the rules and principles of law in relation to the construction of statutes.

We must apply those which have been adopted on the 43 Eliz., as laid down by the supreme court, to the constitution and laws of the state, and construe them most favourably and benignly, for the promotion of all objects connected with the maintenance of religion, the advancement of learning, the relief of the poor, and public utility; so that the rights, privileges, immunities and estates thus guarantied, shall be enjoyed unimpaired here, at least as far as they are in England, by this statute. No one can compare its provisions with the legislation of the state, and hesitate, for a moment, in saying, that they fall far short of the protection given by our own laws to donations for pious and charitable uses. If the 43 Eliz. has by universal consent been considered as *pro tanto* a repeal of the statutes of mortmain, of superstitious uses, and restraints on corporations by the statutes of wills, they cannot be in force in this state, unless we reverse the whole course of the law, in the exposition of statutes, by construing them liberally in favour of forfeitures, and strictly against charities, so as to abrogate common law rights by equity, and defeat the remedy provided by statutes for their protection.

It must be remembered, that these are mere statutes of policy in contravention of the common law. The old statutes of mortmain were passed to prevent the king and mesne lords from being deprived of their seignoral and feudal rights accruing by prerogative and tenure. The statutes of Hen. VIII.

[ Magill *v.* Brown. ]

and Edw. VI. were aimed avowedly against the rights of the catholic religion. Its suppression being their great object, donations for its support were declared " to be superstitious uses, *mala in se,* and destructive to our constitution and government under the protestant religion; therefore the law prohibits them, but it is not so with charities, which have always been favoured." The true foundation of the statute of mortmain of 9 Geo. II. was, that enough of lands had got into the hands of corporations that were indissoluble; and even now charities may be established in the lifetime of a person, but shall not be done in his last moments; 3 Atk. 148, by Lord Hardwick. The history of the times gives another reason for this statute : it was passed in the session of 1735-6, during a period of high excitement against the catholics, and when the church was deemed to be in such danger that a bill for the relief of the Quakers from severe disabilities was thrown out in the house of lords after passing the commons; 5 Hume 617-18; 3 Rapin 225-6.

It is not congenial to the policy of this state to incorporate such principles into its system, nor would it be creditable to the character of its legislation, to expound it unfavourably to those rights and institutions which were favoured, protected and spared by the laws of a king who spared little besides. If any statutes were suited to the policy of the state, they are the 43 Eliz., and the 7 & 8 Will. III. ch. 37, an act for the encouragement of charitable gifts and dispositions, which in favour of learning, charity and other good and public uses, authorized the king to grant licenses to any person or persons, bodies politic or corporate, their heirs and successors, to purchase and alien land, in mortmain, in perpetuity or otherwise, without being subject to forfeiture; 3 Ruff. 636. It may well be presumed, that the emigrants from England brought with them these principles for adoption, and engrafted them into their system of religious toleration and charities; but that they ever adopted any law which created a forfeiture for an alienation of property to any religious, literary or charitable society or corporation, or prohibited donations for the uses of worship, according to the ritual of the catholic church, is utterly inconsistent with the established usage, and every law of the state or colony from the earliest to the present time.

The law must be settled beyond all doubt before we can feel justified in deciding, that the rights of religious societies, and of charitable and literary institutions in Pennsylvania, are less firmly established than they were in the mother country.

As to the statutes of superstitious uses, it suffices to say, that where there can be no religious establishment, no restraint on the free exercise of religion, and no preference of modes of worship, the celebration of divine service according to the rites of any church or society worshipping the supreme Being, cannot be deemed unlawful or superstitious; nor can an actual incorporation or express license be necessary to give to any society or body of men, the capacity of enjoying any right in accordance with a custom or usage, incorporated into the constitution, in order to save a forfeiture, by an alienation in mortmain, where none is in a like case imposed by the law of England.

The revolution devolved on the state all the transcendent power of parliament, and the prerogative of the crown, (4 Wheat. 651,) and gave their acts the same force and effect; consequently, a grant, charter or law made by its

[ Magill *v.* Brown.]

authority is, by the principles of the common law, equally binding on the state, as a patent or act of parliament is on the king. The state can take no estate by forfeiture when the *alienation is expressly authorized by its laws,* and the enjoyment of the estate secured to the grantee by constitutional provisions, which except the subject matter from all the powers of government.

It would be a remarkable feature in the legislation of the state, if, while its successive constitutions have made the rights of bodies united or incorporated its especial favourites, and its laws give the right of self-incorporation to all religious, literary and charitable associations, and so far depart from the jealous policy of the state against chancery jurisdiction, as to provide special remedies for the execution of trusts in their favour, both as to real and personal property, they should be still considered as reprobates, outlawed by the statutes of mortmain, and their estates forfeited by the very act of a conveyance to a corporation directly, or to trustees for their use. If any, the least respect is paid to the constitutions, they must be considered as placing corporations on the same footing at least, if not a better, than in England; yet if the judicial *dicta* which we find in the cases are the law of the state, the statutes of mortmain are in full force, while those which have softened their rigour have not been adopted, and the supreme law of the state is a very nullity, incompetent to protect charities, even to the extent of the 43 Eliz. or the 7 & 8 Will. III. There is no escape from this conclusion, if we take these *dicta* as the settled law of the state. If the statutes of mortmain are a part of the jurisprudence of the state, they have been so from its first settlement; and as they have been in no way modified or altered, they must be taken to have been adopted to their full extent, so as to cover the mischief they were intended to remedy, by creating the forfeiture, and giving the state the right to seize the lands aliened, or the mesne landlord to enter, as the land may have been held under the one or the other; 7 S. & R. 320.

As the tenures of Pennsylvania are free and common socage, there were no seignoral rights accruing by tenure, which could be defeated by an alienation in mortmain, except in case of a person seised of lands, dying intestate, and without known kindred, when the land escheated to the immediate landlord of whom it was holden, or to the proprietary, if he held immediately from him; according to the colonial law of 1705, (1 Dall. App. 45, § 12,) which remained in force till 1787, when the escheat was declared to be to the state; 2 Dall. 553. The mesne landlord, then, was till that time, entitled to the benefit of the forfeiture, and the license of the king or proprietary was no dispensation without the consent of the party to whom it accrued; the king could renounce his own right, but not the right of a subject: before the statute of Will. III., it could be done only by the power of parliament; Vaugh. 333–43–56; Co. Litt. 99 a. By the law of England, the license of the king and mesne lords is not alone sufficient; there must be a writ of *ad quod damnum,* to ascertain what damage it would be to any other person, to alien in mortmain; F. N. B., Ad. Q. D. (222) 493, &c. It follows, that a patent, license or charter from the proprietary, under the colonial government, or from the president of the council, before 1787, would not have saved the forfeiture to the immediate landlord, without his consent, and the writ of *ad quod damnum;*

[ Magill *v.* Brown. ]

for if the statutes were in force, either by adoption or as " the general course of the law of England," or the common law, they remained in force till they were altered or repealed, as declared in the acts of 1718 and 1777, as fully as if they had been re-enacted; and a license can have no greater effect here than it had in England before the statute of 7 & 8 Will. III., which was passed in 1695, thirteen years after the charter to Penn. " With respect to English statutes enacted since the settlement of Pennsylvania, it has been assumed as a principle, that they do not extend here, unless they have been recognised by our acts of assembly, or adopted by long-continued practice in courts of justice;" 3 Binn. 597. As there is not a spark of evidence of such recognition or adoption, we have no legislative or judicial authority for saying that it is now in force; consequently, no license would save the forfeiture before 1787.

The supreme court has declared it to be a point conceded, that the 43 Eliz. has not been extended to this country. " But we consider the principles which chancery has adopted in the application of its principles to particular cases, as obtaining here, not indeed by the force of the statute, but as part of our common law, and where the object is defined, and we are not restrained by the inadequacy of the instrument which we are compelled to employ; nearly, if not altogether, we give relief to that extent that chancery does in England;" 17 S. & R. 91. Assuming this position of the court to be correct, the inevitable conclusion is, that we have not adopted the great operative principles, by which it has been held in courts of law, as well as in equity, to be a repeal of the statutes of mortmain, *de donis conditionalibus*, and of the restriction on corporations by the statute of wills; 3 Atk. 150. This is the effect produced, which has given to that statute its importance: those statutes interposed barriers to the vesting and enjoyment of property for pious and charitable uses, which the 43 Eliz. removed, so that they became opened for the exercise of the equity powers of courts of chancery as completely as if no previous disability by statute had ever existed; and this is the reason why it has ever been considered in England as the Magna Charta of charities, that, being an enabling statute, it repealed all disabling ones.

If we assume that this leading feature, this vital spirit of the statute, has not been adopted here, we should be bound to consider the prohibitory statutes which it repealed, as in force here in all their rigour; if we follow the report of the judges made in 1808, as explained and adopted by the declaration which they made in subsequent cases, in connexion with the opinion in *Witman* v. *Lex,* above quoted, we must declare the law of mortmain to apply to all donations of land to corporations, for pious and charitable uses, without the benefits of the statutes of Eliz., or Will. III., to mitigate their severity or save the forfeiture. Strange as this result may be, it is unavoidable, if the protection which these statutes throw around charities in England does not exist here, or has been taken away by the statute, common law or usage of the state. They operate equally on all societies, whether incorporated by prescription, by special act of assembly, or the charter of the proprietary; so that the enjoyment of their estates depends on legislative discretion, in granting a dispensation of the forfeiture, accruing by an alienation to bodies, and for purposes not only valid, but favoured, encouraged and protected in

[*Magill v. Brown.*]

England, without license, under the 43 Eliz., or by the license of the king under the 7 & 8 Will. III. This latter statute was passed shortly after the first settlement of this colony; its words show the policy of the times to be favourable to all charitable institutions, and connected with the political history of England, its passage is a striking illustration of the disposition of parliament to make them its peculiar favourites.

One of the great principles of the revolution of 1688, was a denial to the king of the power of dispensing with, or suspending of laws, or the execution thereof. It was the first item of abdication of the crown by James II., as set forth by the lords and commons in convention, that he had exercised it with-out consent of parliament; and a declaration that it was illegal, was the first and second items of the bill of rights, (3 Ruff. 440–1,) which was made a fundamental law of the kingdom. There could therefore be no stronger indication of the spirit of the times in favour of charities, than by authorizing the king to dispense with the statutes of mortmain in their favour, making it an exception to a great rule and principle of government; and we deem it incredible, that a less liberal spirit could have entered into the legislation of the colony: yet, if the statutes of mortmain have been adopted, there can be no power to dispense with their forfeiture, but by the legislature. The principle of the revolution of 1688 has been carried into all the American constitutions: no governor can exempt a corporation from the forfeiture of mortmain by his license or charter, with a clause of *non obstante statuto;* and no act of assembly before or since the revolution has exempted charities from the effects of mortmain. There are, therefore, but two alternatives for us to adopt; the first, that the statutes of mortmain have been in force from the first settlement of the province, that the statutes which, in England, have mitigated their rigour, and made them in some measure conformable to our usage and condition, the laws and constitution, have not been adopted, and that there has never been any power to dispense with the forfeiture, unless in the party to whom it accrued. Or, that they never were introduced by our ancestors, as any part of their code. In the choice of these alternatives, we cannot hesitate—we cannot look at one item of legislation upon the subject, whether of supreme or subordinate authority, or into the ancient customs and unbroken usage of the state, without at once perceiving the total repugnance between the whole policy of the state, and the existence of British statutes, which would compel us to declare that every house of worship erected in the colony from the time of William Penn, stands upon ground forfeited by a conveyance to a religious society or corporation. It was due to the weight of judicial authority which bore on these questions, to examine them through the details of the law of England, as well as of the state, before we would venture to dissent from it; it was due especially to the high legislative authority which has declared what in its view was the policy and law of the state, as to the disabilities of corporations. The thirty-fourth section of the judiciary act makes it our duty to make state laws the rule of our decision, unless they are repugnant to the constitution, laws or treaties of the United States. The preamble to the act of 6th April last, contains a plain declaration, that "no incorporation, though lawfully incorporated or constituted, can, in any case, purchase lands within this state,

[ Magill *v.* Brown. ]

either in its corporate name, or names of any person or persons whomsoever, for its use, directly or indirectly, without incurring the forfeiture of said lands to this commonwealth, unless said purchase be sanctioned and authorized by an act of the legislature thereof; but every such corporation, its feoffee or feoffees, hold and retain the same, subject to be divested or dispossessed at any time by the commonwealth, according to due course of law; Pamph. 467–8. On the other hand, we have the supreme law of the state in two constitutions, declaring—one, that the declaration of rights is hereby declared to be a part of the constitution of the commonwealth, and ought never to be violated on any pretext whatever; the other, that every thing contained in the bill of rights is excepted from the general powers of government, and shall for ever remain inviolate: among these rights are enumerated those of "all religious societies, or bodies of men heretofore united or incorporated for the advancement of religion and learning, or for other pious and charitable purposes, which shall be encouraged and protected in the enjoyment of the privileges, immunities and estates," &c., in the constitution of 1776; and "the rights, privileges, immunities and estates of religious societies and corporate bodies," are, by that of 1790, declared to remain as if the constitution had not been altered, and the first article of the schedule expressly saves the rights of incorporations.

We have felt it our duty to consider the law of the state to be as thus declared, and we have been unable to bring our minds to any other conclusion than that any English statute which impairs the right of any corporation to enjoy an estate for its own use, is entirely inconsistent with the usage and constitution of the state, and could never have been in force by adoption, without deranging the whole system of policy, built up by a uniform course of the common law and legislation of the state for a century and a half.

If, however, we have not succeeded to that extent, we apprehend there can be little doubt that these propositions may be considered as established: 1. That, construing the legislation of the state by the rules which have been applied to the 43 Eliz., the statutes which would prevent the effectuation of any objects declared lawful, and by any disposition made valid and confirmed by law, must be considered as repealed so far as they embrace these objects and dispositions. 2. That conveyances and devises of land for religious, charitable, literary and public purposes, must be taken to be, within the meaning of the act of the 6th April, 1833, a purchase "sanctioned and authorized by an act of the legislature." 3. The constitution is an act of the supreme legislature of the state, which authorizes all societies or bodies of men, united or incorporated, to hold and enjoy to themselves, and in their own names and right; and the acts of 1730, 1818 and 1825, are legislative sanctions of their right to hold and enjoy lands, money and chattels for all these purposes.

We should have rested satisfied with results so satisfactory to our minds as these, if they had not been in some respects at variance with the understanding of the supreme court of the state, as to the law of mortmain, and the decision of the court in the *Baptist Association* v. *Hart*. Opposed to such authority, it would have been our duty to have surrendered our own judgment, unless we had found it supported by the constitutions of the state, and the United States.

z

[ Magill *v.* Brown.]

Bound to decide on the laws of a state, as the courts of a state do, we must look to that which is supreme, as the only rule of our decision, where its language is plain; in its application to this case, it cannot be mistaken, nor can we overlook the first amendment to the constitution of the United States, which, in our opinion, wholly prohibits the action of the legislative or judicial power of the union on the subject matter of a religious establishment, or any restraint on the free exercise of religion. We know of nothing which would so directly tend to infringe this prohibition as a law to declare that no religious society should be capable of enjoying land for the purposes of sepulture, worship or charity, without a license from the state; if the legislature can seize it as forfeited, they may impose the most effectual restraint on religious worship, by taking from the society the ground whereon, and the building in which they celebrate it; and no preference of modes of worship can be so repugnant to the rights of conscience and equality of religious right, as to license one society to do what they prohibit to another. With such rules for our guide, we could follow no other.

The objection to the devise of the eight acre lot is thus narrowed to the want of residence of some of the members of the yearly meeting in the state. This is founded on the act of 1730, which is confined to religious societies within the province. In the case of the *Methodist Church* v. *Remington,* the supreme court say, "if the trust before them is to be sustained only by the enabling provisions of the law of 1730, it must fall: on the other hand, it is fair to say, that, though it derives no support from the statute, it is not necessarily prohibited by it; for it is an undoubted rule of construction, that an affirmative statute such as this, does not take away the common law, and there was certainly no absolute prohibition of such a trust by the common law, or any previous statute." The objection is therefore not sustained by this decision, still less by the opinion in the case of the *Baptist Association* v. *Hart,* where the court declared that a devise in Virginia to a charity in Pennsylvania would have been good if the plaintiffs had been capable of taking; (4 Wheat. 27–29,) and it is in direct opposition to the common law in relation to bequests of personal property for charitable purposes, to be expended in Ireland, (1 Br. Ch. 274,) Scotland, (1 Br. Ch. 571; Amb. 236; 14 Ves. Jr. 537; 16 Vez. Jr. 337,) or for the support of a bishop in America, (1 Br. Ch. 444,) all of which have been held to be good; 3 Pet. 500–1–2.

The yearly meeting of Philadelphia is a protestant religious society, which has existed from the settlement of the colony, with known and recognised capacity of taking and enjoying property according to the law and usage of the province and state, as well as the principles of the common law. They must be considered as a body politic or corporate by prescription, possessing and enjoying the franchise of succession, with the same rights of property as a natural person does by inheritance. We cannot impair the rights of the body united by their franchises, by inquiring into the separate capacity of its component members. They might be in part persons who could not hold for their separate use; but that would not change the character of the society, nor affect their constitutional rights as a body united for the purposes of religion and charity, located within the state; and, as such, they would come within the equity, if not the words, of the law of 1730. Be that as it may, they can-

[ Magill *v.* Brown. ]

not be excluded from the protection of the constitution and usage, in the absence of any law requiring the residence of all its members within the state, or any rule of the common law, which imposes any disability upon the citizens of one state holding property in any other state, as its own citizens may do. The objection to the bequests of money to the quaker societies in Maryland, Virginia, Ohio, and to the citizens of Winchester, assumes a different shape. Their alleged incapacity arises from their being composed wholly of the residents of other states, which must be tested by the law of the domicil of the testatrix. There is none which denies to the citizens of other states any rights of property which can be enjoyed by the citizens of this state under its constitution and laws, which declare them inherent in all persons. The laws for the enforcing the execution of trusts extend to all " personal property vested in any person or persons, to be applied by them to any religious, literary or charitable use or uses," and the *cestui que trust*, or other person interested in the execution of the trust may apply to the courts of the state to compel the trustees to account, or to prevent the failure of the trust.

· The constitution of the United States declares, that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states;" this instrument was adopted by the same power which established the constitutions of the several states, and is a part of the supreme law of each, as fully as if it was incorporated in its body. We must take it therefore as a grant by the people of the state in convention, to the citizens of all the other states of the Union, of the privileges and immunities of the citizens of this state; no law of the state has given it any construction which in any way restricts its operation, and it is not the duty of any federal court to so expound the constitution as to weaken the bond existing between the states which have established a "general government of the union," a federal government of these states, by restraining the grants of rights or powers within limits narrower than the tenor and purport of the words used, according to their common acceptation.

"It cannot be presumed that any clause in the constitution is intended to be without effect, and therefore such a construction is inadmissible, unless the words require it." 1 Cranch, 174–6. This clause is copied from the fourth article of the old confederation, and is one of the most important in the whole instrument; it becomes senseless if it is not applied to the rights of property. The political rights of the citizens depend on the laws of the respective states, (Art. 1, § 2, clause 1, Const. U. S.,) rights accruing by contract cannot be impaired in their obligation by state laws, (Art. 1, § 10,) and personal rights are protected by the 2d and 3d clauses of § 9, Art. 1, of the constitution, and the 9th amendment; leaving no subject on which this clause can operate except property.

The words "privileges and immunities" relate to the rights of persons, place or property; a privilege is a peculiar right, a private law, conceded to particular persons or places, (7 Day's Com. Dig. 113, Privilege, A.) whereby a particular man, or a particular corporation is exempted from the rigour of the common law, (Cow. Inst., Tit. Privileges,) as converting aliens into denizens, whereby some very considerable privileges of natural born subjects are conferred upon them, or erecting corporations, whereby a number of private per-

[ Magill *v.* Brown. ]

sons are united and knit together, and enjoy many liberties, powers and immunities in their political capacity, which they were utterly incapable of in their natural. 1 Bl. Com. 272. Among the privileges of the citizens of every state, is that of exemption from the law of alienage, though not born in the state; and every body of private persons united or incorporated have the franchise and immunity of enjoying estates in succession in this state; these are exemptions from the rigour of the common law, which the citizens of other states may enjoy in this, as fully as the citizens of this state can. We can therefore make no distinction between these bequests and those to societies located in the state; the disability of alienage cannot be applied to the citizens, societies or corporations of other states, and they may enjoy property as it can be enjoyed of right by those which are within the state.

The next questions that arise on this will, are the uses for which the various dispositions are made. As the supreme court have declared it a settled point, that the 43 Eliz. is not in force, we must endeavour to ascertain from other sources, what uses are pious and charitable, as distinguished from those which are deemed superstitious or otherwise invalid. The general course of the law of England, as to the transmission of property, was declared, in the charter to Penn, to be the rule in the colonies, till altered or repealed, and the common law was recognised by the acts of 1718 and 1777 as in force, as well as such statutes as had been adopted. It is also a conceded principle, "that the colonists take with them such laws of the mother country as are useful and suited to their condition." 1 Journ. of Cong. 27. It will be necessary, therefore, to trace the law of charities through the English statutes which preceded the 43 Eliz. as well as the common law, so as to determine what was its general course, how far it has been adopted in the written law of this state, or has been the basis of its usage independently of the enabling or enacting provisions of the 43 Eliz. and 7 & 8 Will. III., assuming them not in force as adopted statutes.

The following statutes on the subject come strictly within the description of the supreme court of the United States, in 4 Wheat. 31; they embrace cases within the statutes of mortmain, and gifts to corporations, and are analogous to the 43 Eliz. in all their features; so that there can be no reason for not giving them the same effect and construction as has been given to that statute.

The following are uses declared to be pious and charitable, by a series of statutes commencing in 1285, and affirmative of the common law:—The statute 13 Edw. I., ch. 41, enumerates the maintenance of a chantry, lights in a church, divine service and alms. Keb. 49; 1 Ruff. 106; F. N. B. 465; 2 Co. Inst. 467. The statute 17 Edw. II., divine service, the defence of Christians and the church, liberal alms-giving, relief of the poor, hospitalities, and all other offices and services before due, by whatever name they are called. Keb. 36–7. The statute 15 Rich. II., ch. 6, the poor parishioners of the churches, the endowment of a vicar to do divine service, inform the people and keep hospitalities. Keb. 181; 1 Ruff. 402; S. P., 4 Hen. IV., ch. 12; Keb. 198. The statute 2 Hen. V., ch. 1, the sustenance of impotent men and women, lazars, men out of their wits, and poor women with child; the nourishing, relieving and refreshing other poor people. Keb. 212; 1 Ruff. 486.

[Magill *v.* Brown.]

The statute 23 Hen. VIII., ch. 10, obits, masses and lights, to be kept not more than twenty years; the discharge of tolls and customs in a city in case of the poor, and the cleansing of the streets. Keb. 403–4; 1 Ruff. 171–2. The statute 37 Hen. VIII., ch. 4, § 5, alms to the poor, and other good, virtuous and charitable deeds. Keb. 608. The statute 1 Edw. VI., ch. 14, erecting grammar schools to the education of youth in virtue and godliness; the augmentation of the universities; better provisions for the poor and needy; the support of a schoolmaster, preacher, priest, vicar; the maintenance of pier walls and banks, and the relief of poor men being students or otherwise. Keb. 636–44; 2 Ruff. 397, &c. The repairing of bridges and highways, and setting poor people to work; 2 & 3 Edw. VI., ch. 5; Keb. 651; 2 Ruff. 412; 18 Eliz., ch. 20; Keb. 903–4; 2 Ruff. 623. The relief of the poor of every parish; 5 & 6 Edw. VI., ch. 2; Keb. 676; 2 Ruff. 639. The resuscitation of alms, prayer and example of good life in the realm; Keb. 730; 2 Ruff. 481. The relief of prisoners, 14 Eliz., ch. 5; Keb. 847; 2 Ruff. 606. The repair of churches, 13 Eliz., ch. 10; Keb. 839; 2 Ruff. 595. The maintenance and relief of the poor in houses of correction, impotent and maimed soldiers, 29 Eliz., ch. 6, § 7; Keb. 894; 2 Ruff. 656; 35 Eliz., ch. 1; Keb. 907; 2 Ruff. 672; and hurt and maimed soldiers and mariners, Keb. 911; 2 Ruff. 676. The maintenance of houses of correction, abiding houses, and stocks and stores therefor, 35 Eliz., ch. 7; Keb. 913; 2 Ruff. 678. The founding and erecting hospitals and houses of correction, for the relief and sustenance of poor, maimed, needy or impotent people, 13 Eliz., ch. 5; Keb. 921; 2 Ruff. 687; 2 Co. Inst. 120. Donations to hospitals, colleges and other places, founded, ordained, for the relief of poor, aged and impotent people, and maimed soldiers, 39 Eliz., ch. 6. Schools of learning; orphans, or such other good, lawful and charitable intents and purposes; reparation of high-ways and sea banks; the maintenance of free schools and poor scholars; orphans and fatherless children; and such like good and lawful charities; 4 Co. Inst. 166–7.

To which may be added the cases not enumerated or recognised by the words of the statutes, but which are within their equity, by adjudged cases. The erection of chapels of ease, as members of parochial churches; Hob. 123–4; or cathedral churches; Swinb. 66. Gifts for the advancement of religion, learning, piety and public utility; 11 Co. Rep. 70 b. 73 b.; 10 Co. Rep. 26; 8 Co. Rep. 130 b. Poor men decayed by misfortune or the visitation of God; Moore, 129. Persons imprisoned for conscience sake; Duke by Bridgman, 131. A bell for a church; pulpit cushion and cloth, and building a session house; Poph. 139. To maintain scholars who should use holy orders; Tothill, 61–2. The marriage of poor maidens; 1 Co. Rep. 26. Making a stock for poor labourers in husbandry, and poor apprentices; 1 Co. Rep. 26 a.; Keb. 1040; Ruff. 74; preamble to 7 Jac. I., ch. 3. Such things as concur in decency and order with the intent of the founder; Br. Duke, 155. The 43 Eliz., ch. 4, enumerates twenty-one cases as classed by Lord Coke, in 2 Co. Inst. 711, which were all comprehended in preceding statutes, or the cases above referred to, either in express or general terms.

This review exhibits a striking coincidence between the general course of the laws of England and Pennsylvania, in the designation by both of what are deemed and recognised to be the uses and purposes of piety and charity, protected and encouraged during the most intolerant times.

[ Magill *v.* Brown. ]

The same coincidence will appear in tracing to their origin in the British statutes, and decisions of their courts, the rules and principles upon which donations for such uses have been construed and governed, as well as the remedies provided for their enforcement. The statute 17 Edw. II., *de terris templarium*, established and ordained as law for ever, that lands which had been given and enjoyed for pious and charitable uses, should not escheat to the king or mesne lords of whom they were holden, on the extinction of the order of Templars, by whom they were holden for such uses. That they should be given to other men of holy religion, to the end that they may be charitably disposed of to godly uses. "So always that the godly and worthy will of the givers be observed, performed and always religiously executed;" Keb. St. 86–7; 8 Co. Rep. 131 b.; 10 Co. Rep. 34 b.; Co. Inst. 431–2; 3 Co. Rep. 3 b.; 7 Co. Rep. 13 a. The 37 Hen. VIII., ch. 4, and 1 Edw. VI., ch. 14, directed and empowered the king to dispose to the good, virtuous and godly uses specified in those acts, such parts of the suppressed lands, or their rents and profits, as had before been given to such purposes and misapplied. Also to dispose, change and alter donations given for superstition, to pious and godly uses, or to direct it to be done by the commissioners. The commissioners were directed to inquire what property had been given by deed or will to poor persons intended to have continuance for ever out of the chantry lands, and to make such assignment thereof, that the money should be paid to them according to the conveyance or will of the donor, and that all charges on those lands for charitable or pious uses, should be paid by the king's receiver; Sect. 12, 13. The commissioners were directed to execute their commission favourably and beneficially towards such uses and purposes, and their acts so made were declared as valid as if done by an express act of parliament; Keb. St. 636–44. The proviso in the fifth section of 39 Eliz., ch. 5, prohibited the diversion of the funds of any hospital to any other purposes than those appointed, and declared that such construction should be put upon the act as should be most favourable to the maintenance of the poor, and repressing all evasions of the act; 2 Co. Inst. 721–2. The commissioners were directed to make such orders and decrees as the said good and charitable uses may be fully observed in most full, ample and liberal sort, which not being contrary to the orders, decrees and statutes of the donors or founders, shall stand good according to their tenor and purport; 39 Eliz., ch. 6; 4 Co. Inst. 167. The laws for confirming patents and grants from the crown, declared them to be good and available according to their tenor and effect, their words and purport, and to be expounded most beneficially for the patentee, without license, confirmation or toleration; any misnomer, misrecital or misdescription of the premises, or a corporation, or any lack of attornment, livery of seisin, or misnaming any person or body politic, to the contrary notwithstanding; 18 Eliz., ch. 2; 43 Eliz., ch. 1; Keb. St. 852, 935; 2 Ruff. St. 612, 702.

These statutes were evidently the models from which the colonial acts of 1705, for confirming deeds, wills, and sales under acts of assembly, and the law of 1711, confirming patents, were drawn: the rejected law of 1712, in relation to religious societies, contains a most admirable summary of the effect of the general course of the statutes of England, as they had been construed

[Magill *v.* Brown.]

by courts of equity; and the powers conferred on the colonial courts by the acts of 1700 and 1710, shows the intention of the legislature, that they should be exercised to the same extent and in the same manner as they were by the high court of chancery in England. It is, indeed, impossible to compare the laws of the two countries on the subject of charities, without being struck with the strong analogy between them; the substance of the statute and common law of England was adopted in the early colonial laws, entered into the custom of the province, and will be found condensed in a few words in the 45th section of the constitution of 1776, with this marked difference, that what the 43 Eliz. has done by implication and the construction given by courts, the constitution has done by a direct affirmative declaration of rights. What was left imperfect was finished by the law of 1777, by expressly restoring the common law, repealing all laws inconsistent with the rights declared in the constitution, and declaring all colonial laws then in force and consistent with it to remain in force; this was going farther than the words of the 43 Eliz., which contained no repealing clause.

The law of 1791, giving the powers of self-incorporation to all religious, literary and charitable societies, was an improvement upon the pattern of the 39 Eliz., ch. 5; and the laws for the execution of trusts was an adoption of the whole course of chancery, in administering trusts for the use of charities; so that we may safely conclude that the English system of charities, as it was at the settlement of the colony, has become naturalized here, not only as to the principles of equity, applied to the 43 Eliz. but the substance and effect of the enabling provisions of all the statutes, including those of Eliz., by which the common law as to charities was restored in England, and brought here by the colonists unincumbered with restrictions.

The course of the law of England providing remedies for the enforcement and suppressing the abuses of charities, are next to be considered. The statute, 13 Edw. I., ch. 41, gave the following remedies where the lands were aliened; if the king is the founder, he shall seize and hold the lands, and the purchaser shall lose his money; if a private person is the founder, he or his heir shall have his writ to recover the same land in demesne; if the lands are not aliened, but the alms withdrawn for two years, he shall have an action by writ of *cessavit;* Keb. St. 49; 1 Ruff. St. 106; Keb. St. 30–1; 1 Ruff. 66; Litt. § 136; Co. Litt. 95–6. By the 2 Hen. V., ch. 1, hospitals were placed under the correction and reformation of the ordinary, by the ecclesiastical law; Keb. 212; 1 Ruff. 486. When the king was founder, the chancellor was visiter; Co. Litt. 95 b. 95 a. By the 37 Hen. VIII., all lands held by hospitals, chapels, &c., which came within the purview of the laws for the suppressions of the church lands, were placed under the supervision of the court of augmentations, who decided exclusively all cases concerning them, as well as charities charged upon them, where the king was concerned or could be prejudiced; but all controversies between subjects were to be decided by the courts of common law; Keb. 608–9; 2 Ruff. 371: all copy-hold lands, and all lands held by the license, assent, grant or confirmation of the king, were excepted from the operation of the law; 644–5. By the 39 Eliz., ch. 4, the chancellor was directed to appoint commissioners, to examine into the donations made for certain charitable uses, and correct their misemploy-

[ *Magill v.* Brown. ]

ment; Keb. 920; 2 Ruff. 687. The 39 Eliz., ch. 6, directed commissioners to be appointed, to inquire of land and goods given to any charitable uses, which had been misemployed, and to reform and correct their abuses. The party deeming himself aggrieved, may complain to the chancellor, who shall judge thereon according to equity; 4 Co. Inst. 167. This act was repealed by the 43 Eliz., ch. 9, but the proceedings under it were confirmed, (Keb. 648,) the adoption of the 43 Eliz., ch. 4, as a substitute for it, having made it inoperative. These statutes formed the law of charities in England before the 43 Eliz., and made a system which has received but little improvement, either by that or any subsequent statutes; the rules of their construction adopted by all the courts of England, have ever been of the most liberal tendency, to establish charities and correct the abuse or diversion of the funds devoted to their support.

. The course of the common law on charitable and pious donations is in accordance with the spirit of the statutes before recited, and the rules established for their construction. It is an admitted principle, that the personal property of decedents was disposable to pious uses, for the good of the soul of the deceased; the children and kindred had claims upon the trustees, but came in under the title of charity; the distribution was made by the ordinary at his discretion, to charitable uses in particular, or for the good of the soul of the deceased, according to the circumstances of the estate; 2 Bl. Com. 494; 2 Forrest, 190; 4 Co. Inst. 336; 7 Day's Com. Dig. 612, N. 13; Moore, 822, pl. 1111; Ves. jr. 69. The executor held the surplus to account to pious uses; Carey, 28–29. A *feme covert* executrix, may give the goods of the testator for the good of his soul; Perk. § 7, cites 13 Edw. III. Any person who has power and capacity to make a grant or devise, may do it for pious and charitable uses; 7 Day's Com. Dig. 612; Br. Duke, 132. A testator by will, directed lands which were devisable by custom, to be sold by his executor, and the money to be distributed for the good of his soul; the executor held the land for two years without a sale, which the court held to be a breach of the intention of the testator, and they construed the will so as to make a condition, as such appeared to be the intention, the heir entered for the breach and recovered; 38 Ass. pl. 3; Lib. Ass. 221; Plowd. 345, 523. The king gives land to the good men of D. which was no corporation before, rendering a certain rent, and the residue to repair a bridge, the king released the rent, which being the cause of their corporation, would seem to have determined it, yet for the preservation of the charitable use, they shall continue a corporation for that purpose only; Duke on Charitable Uses, by Bridgman, 134, cites 40 Ass. 26; a gift to a parish for a charitable use by deed, is void, but a devise by will is good, and the church-wardens and overseers shall take in succession. *Ibid.* Land was devised to the church of St. Andrew in Holborn, which was not capable of taking and holding in mortmain, but the court on an *ex gravi querela* brought by the parson to execute the devise (F. N. B. 441, L.) awarded it to him, considering it to be the intent of the will, that the parson should have it, and not the church, and construed the words so as to preserve the intent, and not to destroy it; decided 21 Rich. II.; Perk. § 509; Plowd. 523; acc., 17 S. & R. 92; 9 Cranch, 43, 328; 1 Atk. 437; 3 Pet. 119, 146-7.

[ Magill v. Brown. ]

A declaration by will, that a feoffee shall stand seized to the use of C., is a good devise of the land by intention, it being that C. should have the land. Dyer, 323, pl. 29; 1 Leo. 313; 15 Eliz. A gift of chattels to parishioners who are no corporation is good, and the church-wardens shall take in succession, for the gift is to the use of the church. 37 Hen. VI. 30; 9 Cranch, 328; 17 S. & R. 92; S. P., 1 Penn. Rep. 49–51. Courts will labour to support the act of the party, by the art or act of the law. Hob. 123–5; S. P., 3 Pet. 119. In 4 & 5 Ph. & M., a devise was made of lands to Trinity College and their successors for ever, for founding grammar schools for poor scholars, and held good by the equity of 1 & 2 Ph. & M., ch. 8, which suspended the statutes of mortmain for twenty years. Dyer, 255 b., pl. 7; 1 Co. Rep. 25–6, decided in 8 & 9 Eliz., C. B. Lands devised to employ the profits to find a priest to celebrate mass for the good of the soul of the testator, and other souls, as long as the laws of the land would suffer it; and if the laws prohibited it, then to the use of all the poorest people in six parishes, with power to the devisees to dispose of the profits at their pleasure to any of these purposes—the devise was held good, and not to be within any of the statutes. Anders. 43; Croke Car. 108; 2 Ch. Cas. 18 a., decided 3 Eliz. So of a devise to sustain poor men decayed by misfortune or under the visitation of God. Moore, 129, pl. 277, decided 24 & 25 Eliz.; or to relieve such as were imprisoned for conscience sake. Bridg. Duke, 131, adj. 41 Eliz. A devise to an idiot for a charitable use, though inoperative in his life time, takes effect when the land comes to the hands of his heir. Bridg. Duke, 134. A gift to find a chaplain ad divina celebranda is not for a superstitious use, and, though not within the 43 Eliz., is good. Carey, 39; Bridg. Duke, 154, adj. 18 Jac. I. acc. So for finding a bell for a church, a pulpit cushion and cloth—for the support of the poor, or building a session house—these are good acts of piety, charity and justice. Poph. 139. So where land was devised to divers persons and their heirs, in trust and confidence in them, out of the profits to erect a free school and to pay so much to the master yearly, and so much to the usher, and £20 per annum to five poor men. Croke Eliz. 288, Martidale v. Martin, adj. 34 & 35 Eliz., K. B. The same will contained another devise in trust—that a preacher shall be found for ever to preach the word of God in the church of St. Mary, in Thetford, four times a year, at ten shillings a sermon—both clauses of the will were adjudged good, by the barons of the exchequer and the judges of the K. B., who, after "often argument, agreed, that the 23 Hen. VIII., ch. 10, was to be taken to extend only to superstitious uses, by the words of it, in the very body of the act, and at the beginning, as by the time it was made—for at this time they began to have respect to the ruin of the authority of the Pope and the dissolution of the abbeys, chauntries and the like." Poph. 6, 7, 8, Gibbons v. Maltyard and Martin, adj. 34 & 35 Eliz. So of a devise for a free school, and the support of a master thereof, and certain alms-men and alms-women for ever; the devise was held to be valid, though it did not take effect, owing to the breach of the condition on which it was made to depend. 1 Co. Rep. 22–25, Porter's Case, 34 & 35 Eliz., in Exchequer. In the case of the Mayor and Burgesses of Reading v. Lane, a devise was made to the poor people maintained in the hospital of St. Leonard's, in Reading; the objection to the devise was, that the poor not being incor-

[ Magill *v*. Brown. ]

porated, were not capable of holding lands, but it was decreed, that as the plaintiffs were a corporation capable of holding lands in mortmain and governed the hospital, the land should be assured to them for the use declared in the will. Toth. 7; 42 Eliz. lib. A. fol. 706; Toth. 32; Bridg. Duke, 134 b. 361.

Charities have always been favoured in the law, by excepting them, when fastened on lands, from ordinary rules; where they are charged with services for the advancement of religion or justice, works of devotion, piety or charity, although the lord purchases parcel, yet the entire services remain. 6 Co. Rep. 2 a., 36 Eliz., in the court of Wards. As, to make a bridge or beacon, repair a highway, (6 Co. Rep. 1 b. 2 a.) to marry poor virgins, to find a preacher in a church, or the ornaments of a church, (6 Co. Rep. 2 a.,) or to bind a poor boy an apprentice, or to feed a poor man. Co. Litt. 149 a. The law was considered so well settled that Lord Coke in 34 & 35 Eliz., states unqualifiedly, that any man at this day may give lands in trust for any charitable use, to any person or persons and their heirs. 1 Co. Rep. 26 b.; Sheph. Abr. 1066. They are prohibited by no statute, and none were ever intended to overthrow works of charity, but to prohibit their abuse. Co. Litt. 342 a. The statutes of superstition did not extend to corporations, which were not both religious and ecclesiastical; (2 Co. Rep. 48–9,) gifts to lay hospitals remained valid— bishops, deans and chapters, parsons, vicars, abbots, church-wardens, &c., could hold lands notwithstanding the statutes of mortmain, as they were not dead persons in law, but had a capacity to grant or to hold land, to sue and be sued. 1 Bl. Com. 472–5; 2 Bl. Com. 109. Though they were religious persons, they were also secular, in which capacity, they were considered as natural persons, or bodies politic, and could purchase and hold lands, (Co. Litt. 94 a. b.; Perk. § 31, 35, 55, 51,) before the statutes of mortmain, and can now hold them in all cases where other corporations can. The capacity existed at common law, and was not taken away by the statutes of mortmain, where the uses and purposes were declared good by the statutes providing a remedy, or correcting abuses, which in the language of the supreme court, removed all obstructions and disabilities which in any way prevented the donation from taking effect, and restored them to their common law capacity. 4 Wheat. 31.

Charities were thus left free for the exercise of the jurisdiction of the respective courts, who in all cases gave effect to the disposition of a testator, whenever his intention was expressed, or could be collected from the will, notwithstanding any defect in form, or the want of naming or designating an object to take; they would give it locality, and application to those persons or bodies who were capable, if they could by any reasonable intendment be brought within the devise. As, in the church of Holborn case, they shifted the devise from the church to the parson, because the church could not hold in mortmain, but as the endowment of a vicar or parson was good by the 15 Rich. II., and divine service by the 13 Edw. I., and by 17 Edw. II., it was awarded to him, and he held an inheritance in right of the church as a capable person, the church in effect holding for his use; so, in the Reading case, they shifted the devise from the poor of the hospital, to the corporation which governed it.

The law looks to the substance of the gift, and, in favour of religion, vests

[ Magill v. Brown. ]

it in the party capable of taking it, (9 Cranch, 329,) but without the right to alien it. Wing. Max. 341, pl. 26. This consists in the enjoyment of the thing given according to the intent of the donor. Courts of common law and equity, were astute in devising means of giving it application and effect; whenever the instrument would pass the legal estate, either to the trustee or *cestui que trust* or use, they supported the charity; the mode of establishment, or the distribution, was a circumstance in which they would relieve, according to their respective powers, against any defects in the disposition by will or deed. Their action on charities was not, by any authority assumed from the necessity of the case, but the positive directions of the statutes, to execute and religiously observe the will of the donor, in the most ample and liberal sort, notwithstanding any defects or failures therein; the same rules were prescribed to the special tribunals and courts under whose governance charities were placed, and were applied as liberally in favour of a subject against the king, as between private persons. A donation to a charity, therefore, could only fail for want of a capable object, where there was neither a devisee to use, nor in trust, nor a *cestui que use*, capable of holding; they took effect whenever a trust was created and vested in any body or person who was named, described or could be brought within the scope of the will, and was capable of holding either as *cestui que trust* or trustee.

The cases in which these principles were established, were decided before the 43 Eliz., on prior statutes, or the rules of the common law; they have been approved and acted on by the supreme court of this state, in 17 S. & R. 91; 1 Penn. 51; and by the supreme court of the United States, in 9 Cranch, 43, 53, 328; 9 Wheat. 455–64; 2 Pet. 582; 3 Pet. 119; 6 Pet. 437; and the practical rules of construing the statutes of charities as laid down in 4 Wheat. 31, are those which are to be found in cases not affected by the 43 Eliz., as well as those within it.

The remedies for evasions of the statutes and the abuse or misemployment of charitable donations, were administered with the same liberality by courts of law before as after that statute; the equitable powers conferred on the courts which were to decide on claims for charitable uses out of the king's lands or revenues, evinces the favourable disposition of the king and parliament in their favour. The benign principles of the common law were never displayed in brighter colours than in the course of the courts in the exposition of the statutes of Hen. VIII., and Edw. VI., for the suppression of superstitious uses and religious houses; if any want of liberality has appeared in later times to have entered into the jurisprudence of England on charities, it has arisen from overlooking the provisions, or disregarding the principles of their ancient statutes, which contain all that is valuable in the system, or adapted to the institutions of this country. The statutes of mortmain, of superstitious uses, and the restraints on corporations, are exceptions from the general course of the law of England; legal excrescences which were forced into it by the policy of the times, during the existence of tenures in chivalry, the persecution of the catholic church, and latterly, since the statute 9 Geo. II., by a spirit of hostility to charitable donations by will, all of which are utterly repugnant to the spirit which pervades the common, the statute and the constitutional law of this state. There is no case reported as adjudged

[Magill *v.* Brown.]

by courts of common law against a gift to charity, where words of inheritance were used in a devise to private persons in trust, or for a use, or to any body or society, which had a head known to the law, as being capable of holding for any other use, by statute, charter or usage, local custom or prescription. Perk. § 510, refers to a case decided in 26 Edw. III., of a devise of a remainder to the brotherhood of Whiteacres in London, to find a chaplain to pray for the soul of the testator; the brotherhood was not incorporated or enabled to purchase, and the remainder was held void. Perkins thus introduces this case—"But the commonalty of a company which is not incorporated by the king's charter to purchase, &c., cannot take by devise;"—he states the case and concludes—"And know, that the chief and supreme officers of the fraternity, corporation or guild are taken in law for the best men," &c. These remarks lead to the ground of the decision. The devise was of a remainder, which could not vest without words of inheritance to private persons, or to a corporation by succession; in this case there being neither, the devise failed on the ground that the commonalty or brotherhood, having no politic capacity by means of a head or chief officer, could not hold an estate by succession, and no words of inheritance being used, the remainder in fee continued in the heirs of the devisor, according to the rules before laid down from Sheph. Touch. 235–7, &c. There was no franchise in the commonalty, from which a corporation could be presumed, as in the case from Bridg. Duke, 134, decided in 40 Edw. III.; the statute of Rich. II., authorizing the endowment of a vicar or priest, had not been passed, and by the words of the devise, there was no ground to infer the intention to be that any church or parish should take or hold it, by a parson, overseer or church-warden; so that there was no circumstance on which the court could lay hold to take the estate from the heir at law and give effect to the devisees as in the cases referred to in 9 Cranch, 328, &c. A learned judge considers this to have been a case which could have been aided by the royal prerogative exercised by the court of chancery, (3 Pet. 142,) but it appears to have been one where the king had no interest or claim by statute, prerogative or tenure; the devise not taking effect, the estate remained in the heir of the devisor. The charity was not extinct as in cases under the statute of Templars; it never existed, because there was no devisee in whom the remainder could vest; the king therefore could not make a new appointment by his sign manual, (7 Co. Rep. 36 a.,) nor could a court of chancery disturb the course of the common law, on any ground of equity; such a devise would not be aided in equity under the 43 Eliz., unless the brotherhood could be considered as a corporation by prescription, by some franchise or right to unite them. This case therefore cannot be considered as at all in opposition to those which have been referred to.

So far as the common law could be settled by the repeated solemn adjudications of the courts of Westminster Hall, we thus find it established from the time of Edw. III., without any clashing decision. It only remained to add the sanction of parliament to these principles of the law of charity by a declaratory act to make them irrevocable. That was done in the case of the Thetford school devise, which had been held valid in the two preceding cases, in 34 & 35 Eliz.; Croke Eliz. 288, and Poph. 6–8. This devise was made in 9 Eliz., when the annual value of the land was £35 per annum, it

[ Magill *v.* Brown. ]

afterwards rose to £100; a private bill was exhibited in parliament, 7 Jac. I., for the erection of the school, &c., according to the will, on which two questions were moved:—1. Whether the preacher, school-master, usher and poor should have only the said certain sums appointed to them by the founder, or that the revenue and profit of the land should be employed to the increase of their stipend, &c. 2. If any surplusage remained how it should be employed. The case was referred to the judges, and it was resolved, that the whole profits and revenue should be employed to the increase of the stipends, and if any surplusage remained it should be expended for the maintenance of a greater number of poor, and nothing should be directed to the use of the devisees, executors or heirs, or any private use, it appearing to be the intention of the testator to employ the whole in works of piety, charity, the maintenance and increase thereof, and the bill was passed accordingly. This was in accordance with the rule established in the statute *de templarium,* quoted by Lord Coke at the end of the case; so always that the godly and worthy will of the donors, &c., (8 Co. Rep. 130 b., 131 b.,) which was not a new rule introduced into the law by the act passed for the Thetford school, but as declared by all the judges in the case of Sutton's Hospital, in 10 Jac. I., was declaratory and explanatory of the common law; 10 Co. Rep. 30 b., 34 a. The right to take and hold the land devised for charitable uses with their increased revenues and profits being thus definitely settled by both the legislative and judicial power of the kingdom it has never been questioned since the case of the Thetford school, on which the statute 43 Eliz. had no bearing, and is not even referred to in the report of the proceedings in parliament or the opinions of the judges on the law of the case, as previously settled, in Croke Eliz. 288; Poph. 6-8.

The spirit of equity which pervaded the law of charities, having been extended so as to bring within its protection not only the specific bequests of a testator, but the entire fund on which they were charged, it was not necessary for courts of equity to usurp any of the powers of a court of law, in order to effectuate a charitable donation, or to establish any rules or principles different from those on which the common law courts had acted with the sanction of parliament. Chancery had its appropriate jurisdiction over cases of fraud, accident and breach of trust, arising out of dispositions of property to purposes unconnected with charity ; if the party had a right known to the law, but had no legal remedy, he could resort to the extraordinary powers of the court of chancery for relief, according to its usage and settled principles, which applied to charities as well as other subject matters of its cognizance. To have refused the same relief in the one case as the other, would have placed charities under the ban of the law of equity, though they were the favourites of the statute and common law: if there was any thing in the nature of charities, which would call for or justify the withholding equitable relief for matters not cognizable at law, without special authority by statute, it would have appeared in the course of the law for more than three hundred years before the 43 Eliz. Its history exhibits no feature of the kind; on the contrary, it exhibits the most convincing evidence, that it was peculiarly the duty of courts of equity to obey the injunctions of the statutes, to execute the intention of the donors and founders of charities, and not to suffer their dona-

[Magill v. Brown.]

tions to fail of effect, or to be abused when their intention could be ascertained.

The proceedings of courts of equity are very imperfectly reported prior to the restoration; some few cases are interspersed among the common law reports, but they are mostly referred to in the short notes of Carey and Tothill, which do not give the reasons of the court for their decisions; we are therefore left to infer the principles which governed them from their acts, thus briefly noted, and the elementary writers in or near the time, who have given the results in general terms. Enough, however, can be collected to show satisfactorily, that the general course of equity before the 43 Eliz. in all cases of charities, was according to rules and principles as well settled and defined as on any other subjects, and was the basis on which the law now stands on the construction of that statute.

The jurisdiction of chancery over trusts was never questioned by the most strenuous advocates of the common law; 2 Bacon Abr. 22; Harg. L. T. 431; Treat. Eq. 523; 2 D. C. D. 764. It was coeval with their existence, and its exercise was indispensable in cases where the feoffor, having parted with his whole estate, had no control over it at law; but being made in trust and on confidence, the powers of a court of equity were necessary to deal with the corrupt conscience of the feoffee who refused to execute the trust—the cases of its exercise from the time of Hen. VI. are numerous; 4 Co. Inst. 84; Gilb. Ch. 19, 259; Bohun C. C. 6; 1 Hu. Ab. 400; Lilly Pr. Reg. 57–8; 1 Roll. Abr. 374; Mitf. Pl. 120–1.

The equity and use of the land being to go according to conscience, the subpœna for relief herein in this court is given accordingly. Sheph. Abr. 201, pl. 13, 199. Chancery would not only compel the performance of the trusts specified, but compel the feoffee to do any other acts for the benefit of the feoffor or cestui que use in a deed or obligation. Bro. Conscience, 5, 9, 27, fo. 162–3; Carey, 13, 20, cites cases from the time of Hen. VI. and Ed. IV. It also remedied grievances arising from acts done which were prohibited by statute, but for which there was no remedy by the common law, as waste in certain cases. Car. 26; Moore, 554, pl. 748; Fonb. 32.

All cases of covin and fraud were cognizable in equity, from the earliest times. Toth. 62; Car. 20, 25–6; 4 Vin. Abr. 487; Bro. Conscience, 8; Moore, 620, pl. 846. The performance of verbal promises in temporal matters; Bro. Conscience, 14, fo. 163; Tr. Eq.45. The specific performance of contracts made by competent parties, on good consideration, were also decreed against the party, his heir, and those claiming under him with notice. Toth. 3, 4, 62, 69, 70, 92, 123, 106; Cro. Car. 110; Tr. Eq. 5; 2 Day's Com. Dig. 772.

" Equity will aid the perfecting of things well meant, and on good consideration," and " will reform in conscience that which is badly done," by supplying defects; Car. 23, cites 9 Hen. VIII.; Max. Eq. 57; 10 Hen. VII. 201, pl. 13. It will prevent a contract from failing for want of a circumstance or ceremony, (Carey, 24–5,) as livery of seisin, attornment, surrender of a copyhold, enrolment of a deed, a misrecital; (Toth. 62, 12 Eliz. 79, 38 Eliz.,) or a misnomer of a corporation; Toth. 131, 32 Eliz.; Car. 24, 44; Bohun C. C. 7; Max. in Eq. 57; Toth. 27, 33 Eliz.; Sheph. Abr. 194–5; Hob. 124; Cro. Eliz. 106. Though an estate cannot be created by covenant by law, it shall be made

[ Magill *v.* Brown. ]

good in chancery; Toth. 84, 40 Eliz. So of a lease made to commence during the existence of a former one which would make it void at law. Toth. 127, 25 Eliz.; S. P., 128, 40 Eliz. So where an exception was intended to be made, but it was omitted by mistake, chancery supplied it. Toth. 131, 37 Eliz. So where a devise was void at law, by misrecital of a grant and by reason of an attornment; (Toth. 79, 38 Eliz.,) or a copyhold surrendered at a court held out of the manor where the land lay; (25 Eliz., Toth. 45,) or a conveyance sought to be avoided for want of livery; (Toth. 42, 41 Eliz.,) chancery will relieve, though the defect would be fatal at law. Where courts of equity act upon instruments to take effect in the lifetime of the party who makes an agreement for a valuable consideration, they will make it as effectual for the purposes intended as the party had power to do; (Sugd. Pow. 361,) and in dispositions by will, they will help against all defects which the testator had power to remedy. 1 Mad. Ch. 47–9. The principle on which they act is, that where the parties interested intended to contract a perfect obligation, though by mistake or accident they omit the set form of words, so that there is no legal remedy, yet they are bound in natural justice to stand to their agreement, and "where there is substance, the law will apply the words to the intent, though they sound differently." (Tr. 14; 1 Fonb. 147; Plowd. 140–1,) the imperfect execution of the contract not affecting the equity raised by the agreement. 1 Fonb. 37, 40, 41. Equity, therefore, will supply any defects of circumstances in conveyances; (1 Fonb. 38,) where there is an intent to make a better assurance. Carey 44.

It has never been pretended that the course of equity on these subjects was regulated or in any way affected by the 43 Eliz.; it was founded on principles which were the origin and foundation of its jurisdiction, and became gradually developed according to the exigency of the times. There is no reason which would prevent their application to charities in all cases between subjects, before the 43 Eliz. in the same manner as after; nor is there to be found in any decision or authority, other than the late *dicta* denying it: so far as any traces of its jurisdiction over charities are to be found in the books, it seems to have been under the three heads of fraud, trust and accident, and exercised without any doubt of the power in all cases where either circumstance existed.

In Toth. 58, a case is reported as having been decided in 36 & 37 Hen. VIII. in which the court of chancery decreed lands to the mayor and burgesses of Gloucester, to whom they had been devised for the use of a school and other purposes. When a donor appointed lands or goods to be sold to maintain a charitable use, and did not appoint by whom the sale should be made, it was decreed to be made by persons named by the commissioners, and the money employed to maintain a charitable use according to the donor's intent. Toth. 30; Duke on Charitable Uses by Bridgman, 360, 41 Eliz. In Sir Francis Moore's reading on the 43 Eliz., various cases are referred to which show clearly that charities stood upon the same footing in equity before the statute as they have done since. If a man devise that the executors of his wife shall pay money to be lent to young tradesmen, it is void, because he cannot charge the executors of his wife; but assets belonging to the husband were decreed to be liable to the charitable use. Duke on Charitable Uses,

[Magill *v.* Brown.]

by Bridgman, 136, 40 Eliz.  Land 'sold in confidence to perform a charitable use, which the bargainor declared by his will, the bargain was never enrolled, yet the lord chancellor decreed the heir should sell the land, to be disposed according to the use.  This decree was made 24 Eliz., before the statute of charitable uses, and "was made upon ordinary judicial equity in chancery, and therefore it seems the commissioners upon this statute may decree as much in the like case."  If a reversion be granted to a charitable use, the particular tenant shall be bound to attorn by the decree of the commissioners, and it was said there are precedents in chancery where the lord chancellor had decreed and compelled the tenant to attorn.  Sir Thomas Bromly decreed and compelled the terre tenant to give seisin of a rent seck to the intent the party may bring an assize.  Duke on Charitable Uses, by Bridgman, 163.

From these cases, and the remarks of Sir Francis Moore, it seems that the course of the commissioners and the chancellor, under the statute, was taken from the previous rules of judicial equity, which were settled long before its adoption; it was penned by him by order of the house of commons, (Duke on Charitable Uses, by Bridgman, 122,) which gives great weight to any opinion expressed by him, and to cases which he adopts as law.  He says, no use shall be taken by equity to be a charitable use, within the meaning of the statute, if it be not within the meaning and words of the statute; but the words may be construed by equity, as the repairs of churches extend to all convenient ornaments, and convenients for the administration of divine service.  A gift of lands "to maintain a chaplain or minister to celebrate divine service, is neither within the letter nor meaning of this statute, for it was of purpose omitted in the penning of the act, lest the gifts intended to be employed upon purposes grounded upon charity might, in change of times, contrary to the minds of the givers, be confiscated into the king's treasury; for religion being variable, according to the pleasure of succeeding princes, that which at one time is held for orthodox, may, at another, be accounted superstitious, and then such lands are confiscated, as appears by the statute of charities," 1 Edw. VI., ch. 14.  The effect of this omission is not to make the devise void, but to except such cases from the jurisdiction conferred on the commissioners by the statute.  It is the same as a proviso which declares that nothing in the act shall be construed to extend to colleges, &c., which is only to exempt them from being reformed by commission.  Hob. 136.  So a gift for the maintenance of a chaplain or priest for divine service, will be a charitable use, and in the direction of chancery, though not within the power of the commissioners; 7 Day's Com. Dig. N. 10, p. 609, and cases cited.  As the statute gives to the chancellor no judicial power, except by appeal from the decree of the commissioners, it follows, that wherever he exercises any jurisdiction over cases not within the statute, or excepted from the power of the commissioners, it is independent of the statute; yet the uniform course of equity in such cases, has been to give relief by the same rules and principles as if the case had been included in its enumeration.  The lord keeper and the judges decreed, that money given to maintain a preaching minister, was a charitable use, notwithstanding it is not warranted by the statute, and that the same should be paid by the executor to such maintenance.  *Pember* v. *Kington*, Toth. 34, 15 Car. I.; Bridg. Duke, 381, *Penstred* v. *Payer.*  Where an

[ Magill *v.* Brown.]

endowment was made for a vicar, but was void at law by reason of some defects arising from the ignorance of the donor, it was decreed good in chancery; " For in cases of charitable uses, the charity is not to be set aside for want of every circumstance appointed by the donor,—if it should, a great many charities would fail." Nelson Rep. Ch. 40–41, 15 Car. I., *Joyce* v. *Osburn.* So, where by will a certain sum was charged upon land for a weekly sermon and lecture, it was objected, that the devise was void, " because the case was not in the statute," because " no person was named,"—" part of the land was held *per autre vie,* and not devisable,"—and, " as the sermons had been discontinued, therefore the annuity ought to cease;" but the chancellor held them to be good. 2 Ch. Cas. 18–19; S. P., 32.

This principle has been followed up by various cases, in which devises to chaplains, ministers, preachers, vicars, &c., have been held good, (1 Vin. Abr. 249; 2 Vern. 105; 3 P. Wms. 344; Swinb. 71,) and chancery has decreed the execution of trusts in their favour, without any other authority than that on which they, through all time, acted on matters within their appropriate jurisdiction. 2 Fonb. 210. It was strongly illustrated in a case decided immediately after the statute. In 11 Hen. VI., land was given with intent to find a chaplain to celebrate divine service, until the feoffor should procure a foundation, but was not so employed; the commissioners under the 39 Eliz. decreed the lands to the use,—the chancellor reversed their decree, because the use was not inquirable by them under the statute, but by his chancery authority he did decree the land according to the original use. Bridg. Duke, 154; Carey 39; 3 Jac. I. A decree was made for the heir at law, against certain feoffees who had lands conveyed to them to maintain scholars who should use holy orders. Toth. 61–2, *Crofts* v. *Crofts,* 3 Jac. I.; though this case is not within the statute.

The general principle adopted in chancery, that the performance of a charitable use is equally if not more favoured than the payment of debts, (*Bridg. Duke,* 138, from *Moore's Reading on the Statute,* referred to as laid down in 42 Eliz.;) shows the reason of these decisions to be founded in general rules, to carry the intention of the party into effect, for all lawful objects, especially favoured ones, as is forcibly expressed in a note in Tothill, of a case decided in 38 & 39 Eliz. " The law of God speaks for him, equity and good conscience speak for him, and the law of the land speaketh not against him." Toth. 126. This is the basis of equity jurisdiction; and as there is no subject to which the rule would apply with more force than to charities, so it will be found, that it has been the uniform course of equity to support charitable donations in all cases where they were not prohibited by law;— the inquiry has been, not what uses were authorized, but only what forbidden. Courts of original jurisdiction have taken cognizance of cases excluded from the power of special tribunals, without any statutory authority, and have not considered charities to be excluded from the protection of the law of equity, because they were not made subject to the power of the commissioners under the 43 Eliz. It contains no provision which enlarges the jurisdiction of the chancellor, as a court of equity, or as acting in place of the king by his prerogative or personal jurisdiction; in the appointment of commissioners, he acts as a special officer, selected to perform the duty imposed by the statute;

2 A

[Magill *v.* Brown.]

in sustaining appeals from the commissioners, he acts by the rules of equity and good conscience, and these are the only functions which he is to perform under the statute. Keb. 943–4; 2 Ruff. 708–9. It is wholly silent as to a proceeding by original bill, between private parties, or by information of the attorney general, where the king is in any way concerned, or where the chancellor can act only by the sign manual of the king. It enumerates only twenty-one charitable uses, as classed by Lord Coke, in 2 Inst. 710, and prescribes only one rule to the commissioners in making their decrees: " So as the lands and money may be duly and faithfully employed to and for such of the charitable uses and intents before rehearsed respectively, for which they were given, limited, assigned or appointed, by the donors and founders thereof;"—" which decrees not being contrary to the orders, statutes or decrees of the donors or founders, shall, by the authority of the present parliament, stand firm and good, according to the tenor and purport thereof, and shall be executed accordingly, until the same shall be undone or altered by the lord chancellor," &c. 2 Co. Inst. 710.

This is the substance of the recital and remedial part of this statute; and if the law of charity could be traced to no other source, the system must have remained not only very defective, but would have been extremely illiberal and contracted, if it had rested on the enacting or remedial provisions it contains, or its operation and effect had been confined to the enumerated cases. By recurring to the statutes heretofore noticed, and the decisions of courts of law and equity, before this statute, it will be found, that they comprehend forty-six specifications of pious and charitable uses, which were recognised as within the protection of the law, in which were embraced all that were enumerated in the 43 Eliz. The statutes of Hen. VIII. and Edw. VI., for the suppression of superstition, protected more cases of charity, and prescribed more liberal rules for their establishment and maintenance, than the 43 Eliz. The rules they prescribed to the commissioners, and the courts under which they were placed, are more definite and explicit in favour of charities, even where their establishment would prejudice the rights of the king, than this statute directs in cases between individuals.*

* The following summary list of uses declared by statute and adjudged cases to be valid, as pious and charitable, for which property could be held prior to the 43 Eliz. will fully sustain this position. 1. Gifts for the exercise and celebration of divine service, to find a chaplain, a taper to burn before an image, prayers for souls, the defence of the church, obits, or service of a priest. St 13 Edw. I.; 17 Edw. II.; 2 Hen. V.; 23 Hen. VIII.; 15 Rich II. 2. Free alms, liberal alms-giving and relief of the poor. 13 Edw. I.; 17 Edw. II.; 37 Hen. VIII.; 1 Edw. VI.; these were gifts in franckalmoigne, and were good at common law Litt. § 133; Co. Litt. 93 b. 94 a. &c; 6 Co. Rep. 17; Carey, 39 ; Bridg. Duke, 154; Poph. 6; 8 Co. Rep 130; And. 43; Hob. 124; Plowd. 523; Perk. § 7. 3. Hospitalities. 17 Edw. II.; 15 Rich. II. 4. All other offices and services before time due, by whatever name. 17 Edw II. 5. The employment of a vicar to inform the people, &c. 15 Rich. II. 6. Lazars in hospitals. 2 Hen. V. 7. Men out of their wits. 2 Hen. V. 8 Poor women with child, nourishing, relieving and refreshing other poor people. 2 Hen. V.; 1 Co. Rep. 26 a. 9. The discharge of tolls and tallages to be levied to relieve the poor. 23 Hen. VIII ; 1 Co. Rep 26 a. 10. The cleansing of streets. 23 Hen. VIII. 11. Good, virtuous and charitable deeds. 37 Hen. VIII. 12. Erecting grammar schools and the maintenance of schoolmasters; 1 Edw. VI.; Dyer, 225; 1 Co. Rep. 25; and ushers. Poph. 8; 8 Co. Rep. 130 b. 13. The further augmentation of the universities. 1 Edw. VI. 14. The support of preachers, priests and vicars; 1 Edw. VI.; and parsons. Plowd. 523; 1 Co. Rep. 26. 15. The maintenance of pier walls and sea banks. 1 Edw. VI. 16. The relief of poor men, being students or otherwise. 1 Edw. VI. 17. Repairing bridges and walls. 2 & 3 Edw. VI.; 1 Co. Rep. 26 a. 18. Setting poor people at work. 5 & 6 Edw. VI.; 1 Co. Rep. 26 a. 19. The resuscitation of alms, prayer, and example of good life.

[ Magill *v.* Brown. ]

The same remark applies to the statutes of the 39 Eliz., and if a detailed comparison was made, exhibiting the system of charities by the general course of the law of England, as it stood before the 43 Eliz., and as it would appear from that statute taken alone, no jurist would hesitate in preferring the former as the most perfect and liberal. The contrast would be striking indeed, if we expunge from the latter all which it adopts from former statutes and the common law; or if we take from the rules and principles which have governed its construction, as they are stated in the books to have been founded on its provisions, those which appear to have been finally settled and established previously;—this statute and the great system which has been supposed to have been built upon it, would lose its importance in the view of the profession.

That branch of the personal or prerogative jurisdiction of the chancellor, which is exercised on the information of the attorney general, by appointing a charitable donation to new objects, on the extinction of those to which it was originally devoted, will be found to be derived from the fundamental law of charities, established by the statute of Templars, 17 Edw. II.

The altering and disposing to good and pious uses, donations originally made for purposes of superstition, is a provision of the 1 Edw. VI. The appointment of general and vague charities to definite objects, results from the general direction of the statutes, prior to the 43 Eliz., to make such appointments, "so that the will of the giver shall in all things always be faithfully

<hr>

1 & 2 Ph. & M. 20. The relief of prisoners. 14 Eliz.; Bridg. Duke, 131. 21. The repair of churches. 13 Eliz.; Cro. Eliz. 449; 1 Co. Rep. 26 a. 22. The maintenance of poor in houses of correction. 29 Eliz. 23. For impotent and maimed soldiers. 29 Eliz.; 35 Eliz. ch. 1. 24. For hurt and maimed mariners. 35 Eliz. ch. 1; Mo. 889, pl 1252. 25. The maintenance of houses of correction and abiding houses. 35 Eliz. ch. 7; 39 Eliz. ch. 5. 26. For stocks and stores for them, and the use of the poor. 39 Eliz. ch. 4; 1 Co. Rep 26 a. 27. To erect and found hospitals. 39 Eliz. ch. 5; Co. Litt. 342 a.; 10 Co. Rep. 25, &c. Hob. 123; Toth. 32; Mo. 865, pl. 1194. 28. Schools of learning, colleges and hospitals, for the relief of the poor. 39 Eliz. ch. 6. 29. For the relief of orphans and fatherless children. 39 Eliz. ch. 6; Swinb. 66. 30. And such like good and lawful charities. 39 Eliz. ch 6. 31. Repairing bridges and roads; 39 Eliz. ch. 6; making bridges and beacons. 6 Co. Rep. 1-2. 32 Maintenance of free schools and poor scholars. 39. Eliz. ch. 6. 33. Or such other good, lawful and charitable purposes and intents. 39 Eliz. ch. 6. 34. The true labour and exercise of husbandry. 7 Jac. I, ch. 3, preamble; Keb. St. 1040; 3 Ruff. St. 74, recited as profitable to the commonwealth and pleasing to God. 35. The bringing up of apprentices of both sexes in trades and manual occupations. 7 Jac. I. ch. 3. 36. The making a stock for poor labourers in husbandry—poor apprentices, and to set them at work. 1 Co. Rep. 26 a. 37. For chapels of ease, erected as members of parochial churches. Hob. 123-4. 38. For erecting cathedrals—of money for their support. Swinb. 66. 39. For the advancement of religion and learning, and the maintenance of the poor. 11 Co. Rep. 70 b. 40. For public benefit. 11 Co. Rep. 73 b. 41. Works of piety and charity, or any other charitable use. 1 Co. Rep 26 a.; 8 Co. Rep. 130 b. 42. Poor men decayed by misfortune, or the visitation of God. Mo. 129, pl. 277. 43. Persons imprisoned for conscience sake. Bridg. Duke, 131. 44. A bell for a church, pulpit cushion and cloth, for a session house, or for the ornament of a church, or vestments for service. Poph. 139; 6 Co. Rep. 1-2. 45. The marriage of poor maidens. 1 Co. Rep. 26 a.; 6 Co. Rep. 1 b., 2 a. 46. For any charitable use; 1 Co. Rep. 26 a.; Shep. Abr. 1066; and such uses as concur in decency and good order with the intent of the founder. Bridg. Duke, 155.

The twenty-one cases enumerated in the statute 43 Eliz. are the following:—1. The relief of aged, poor and impotent people. 2. The maintenance of sick and maimed soldiers and mariners. 3. Schools of learning. 4. Free schools. 5. Scholars in universities. 6. Houses of correction. 7. Repairs of bridges. 8. Of ports or havens. 9. Of cawsies. 10. Churches. 11. Of sea banks. 12. Of highways. 13. For education and preferment of orphans. 14. For marriage of poor maidens. 15. For supportation, aid and help of young tradesmen. 16. Of handicraft-men. 17. Of persons decayed. 18. For redemption or relief of prisoners or captives. 19. For ease and aid of any poor inhabitants concerning payment of fifteens. 20. Fitting out soldiers. 21. And other taxes.

[ Magill *v.* Brown. ]

observed and religiously executed ;" (17 Edw. II.,) and that the decrees "shall be most beneficial in favour of the charities specified ;" (1 Edw. VI.,) so that the said charitable uses may be observed in the most liberal and ample sort. 39 Eliz. General charities are embraced in the 37 Hen. VIII. as "good, virtuous and charitable deeds;" and in 1 & 2 Ph. & M., "the resuscitation of alms, prayer and example of good life;" and in 39 Eliz., ch. 6, "other good, lawful and charitable purposes and intents;"—they were also under the superintendence of the king, as *parens patriæ.* So that in all these cases, the 43 Eliz. has no direct or indirect effect in giving any jurisdiction to the chancellor. The appropriation of the increased profits and revenues of land charged with a specific sum to charities, to the same objects as those specified; and the rule which prevents their going to the heir, or any other use than the charity, is founded on the statute of templars, and the common law, as declared in 8 Co. Rep. 131; 10 Co. Rep. 30.

The words "given," "limited," "appointed," "assigned," were taken from the 1 Edw. VI. ch. 14, and 37 Hen. VIII. ch. 4, (2 Ch. Cas. 18,) these are the words on which the effect of the statute has been mainly founded, and courts have extended them very far; (P. C. 271,) but their meaning is the same in all the statutes. An assignment of the suppressed lands to charitable uses by commissioners, under the statute 1 Edw. VI., ch. 14, § 13, had the same effect as an act of parliament, and the final decree of the court of augmentations of the revenue, the court of wards, or exchequer, establishing a charity on the lands or revenues of the king, was conclusive on his rights, let them accrue from whatever source : it followed that such appointment, assignment or decree, by the authority of parliament, had all the effect of a charter, license, and *non obstante statuto,* or special incorporation.

Independent of any statutory jurisdiction, charities belonged to the king as *parens patriæ,* and fell under the care of chancery by the same authority which they exercised over infants, idiots, lunatics and wards of the king, before the erection of the other courts to whom the powers of the chancellor were transferred. 2 Vern. 342; 2 P. Wms. 103–18; 1 Bl. 90–2; 2 Bl. 328; Gilb. Eq. R. 172. The erection of new courts, or the authority conferred on commissioners to do what had before belonged to the chancellor, *virtute officii,* or by sign manual, was therefore only a devolution of his powers on the other tribunals; not the creating of a new power not before in existence, nor was the effect of their acts any greater by their special authority than the decrees of the chancellor, in virtue of his inherent or prerogative jurisdiction.

The law on this subject was so well settled, that in the 43 Eliz. the attorney general, Coke, and the two chief justices, Popham, Sir Francis Moore, and Anderson, by command of Sir Thomas Egerton, keeper of the seal, reported the following resolutions, on divers points on the 39 Eliz., ch. 6, directing commissioners to redress frauds and breaches of trust of lands and goods given to charitable uses. If the commissioners decree a lease or feoffment to be void, it is void in interest and estate. If the chancellor decrees it good, it is again good interest, but they thought that the chancellor could make no decree, unless the decree of the commissioners was against equity. That the commissioners could decree the payment of mesne profits received and misemployed, as well as make orders for the future profits. That the word

[ Magill *v.* Brown. ]

" given," in the proviso excepting hospitals and towns corporate, extends to gifts after the statute, as well as to gifts before. That they could not by a decree, establish a corporation of church wardens, or others, to take for a charitable use, but they could decree land to a capable body politic, without danger of mortmain, whether the land was held *in capite* or not, because the king is bound by the statute in that point. That they could appoint lands to natural persons, and their heirs to hold in continuance for charitable uses. That they had power to reform abuses in such corporations as were out of towns corporate, to add land to them, or make orders for them which should have the same effect, as parliament, by private acts of incorporation for charitable uses, gave, as to all things in which the law does not prescribe any special cause or favour. Moore Rep. 559–60, pl. 762; Moore Abr. 158, pl. 727. There can be no danger or error in taking the resolution of these common law lawyers, as the settled rule by which charities were administered up to this time; there certainly is none in following the statutes which are yet in force, and the adjudications of courts which are recognised as law to this day, as the "general course of the law of England." In thus divesting the 43 Eliz. of its borrowed words, uses and provisions, it will be found that there remains but one important office which it has performed by its exclusive operation in aid of donations to charities—that is, to remove the disability imposed on corporations by the statute of wills.

In other respects, it can be considered only as an item in the legislature of England, which, taken in connexion with the decisions of the courts, framed · the general course of the law on the subject of charities, which had become well defined and systematized; so much so, that we find much less litigation on charities before the 43 Eliz., than immediately afterwards. This was the consequence of the repeal of the 39 Eliz., ch. 6, and the very limited enumeration of uses in the 43 Eliz., which compelled the courts virtually to re-enact it by construction. In addition to the preceding view of the jurisdiction of chancery over charities, there is a general principle of the law of England peculiarly applicable to this subject.

It is provided by an old statute, that no man shall go from the king's courts without remedy for his right; (13 Edw. I., ch. 50; Keb. St. 52; 1 Ruff. St. 111–12,) and was declared as a rule of equity by the chancellor, in 4 Hen. VII., fo. 5; Bohun's Ch. Cas. 3; 2 Co. Inst. 405–8, 485; 12 Co. Rep. 114 b.; Hob. 63; 3 Bl. Com. 52; 2 Day's Com. Dig. 340–68–70; 1 Ch. Rep. App. 20, 48. The whole judicial power of the kingdom is vested in the different courts, (4 Co. Inst. 70–1,) and there can be no failure of justice by defects of courts, for when particular courts fail of justice, the general courts shall give remedy. 4 Co. Inst. 213; 1 Bac. Abr. 554–5; 12 Co. Rep. 114. They are supreme within their respective jurisdictions, and that of equity extends to all rights recognised by the law for which there is no legal remedy, the cognizance of which has not been transferred to some other court; 4 Co. Inst. 84. The jurisdiction of chancery, according to equity and good conscience, extends to all cases cognizable in equity, and the party objecting to its exercise must show that some other court of equity has cognizance of the case; 4 Co. Inst. 82; 1 Bac. Abr. 560; Mitf. Pl. 183; Beame, 57, 91; 2 Vern. 483; 1 Vern. 59; 1 Ves. 204; Dick, 129.

[ Magill *v.* Brown. ]

Its course is governed by usage, without any statutory restraint as to persons or the subject matter—except cases affecting the rights or prerogative of the crown, to which it is extended either by statutes or warrant from the king; but is not exercised in virtue of the equity powers of the court; (4 Co. Inst. 79, 82; Bohun's Ch. Cas. 56; Hob. 63; 2 Atk. 553; 3 Atk. 635,) or the 43 Eliz.; 2 Co. Inst. 552. In acting on cases between subjects, the jurisdiction exercised is that which is inherent in chancery as a court of equity, depending on its usage, and co-existent with its existence, by the same rules as are prescribed to the chancellor on an appeal from a decree of the commissioners under the 10th section of the 43 Eliz., which adopted its old principles.

It is the same jurisdiction which the constitution confers on the courts of the United States, by the words "cases in equity," and which the laws of this state of 1825 and 1828 confer on the state courts in cases of trusts, "according to the powers and rules of a court of equity," which this court can exercise to the same extent as in England; subject only to the restriction of the 16th section of the judiciary act, where there is a remedy at law; *Baker* v. *Biddle*, C. C., MSS.; 3 Pet. 446–7; 2 Pet. 525–6. It is therefore clear, that the extraordinary jurisdiction of chancery was always applicable to charities in England; whenever there was a right to hold property for a charitable use, there was a remedy in the appropriate court, according to their respective jurisdiction, to be administered by its ordinary rules and principles without the aid of any new statute. It is also clear, that the personal or prerogative jurisdiction of the chancellor existed before the erection of the court of Wards, (2 Atk. 553,) and that the court of chancery exercised its jurisdiction at large on cases of charitable uses before the statute, and that there may be a bill by information in that court founded on its general jurisdiction; 2 Ves. 327–9.

There is no case reported or referred to, wherein chancery has refused to sustain a bill or information for the establishment of a charity for the want of jurisdiction; there could be no failure of equitable relief in a proper case, either between a subject and the king, or subject and subject, for before the erection of the courts of augmentations and wards the chancellor was invested with all the powers which were given to those courts which were most ample for all purposes of charities.

The case of the *Queen* v. *Porter*, in 1 Co. Rep. 22, has been considered as opposed to this position, and the importance given to it by the supreme court of the United States, in 4 Wheat. 33–4, makes it necessary to bestow some attention upon it. The case is too familiar to the profession to be stated, but one historical fact is stated by the Lord Chancellor, in 3 Ves. Jr. 726, which fully accounts for the course of proceeding—the devisee "instead of performing the will made a long lease, and the mode taken to effectuate the charity was this—they found the heir at law, and he having entered, conveyed to the queen, by which means she had it in her power to establish the charity." The attorney general filed an information of intrusion in the Exchequer against Porter, who was in possession under the devisee, on which there was a judgment in favour of the queen, which is equivalent to a recovery of possession, as the defendant in such cases is subject to a fine which he can avoid only by making terms; it only remained for the queen to grant a charter to effectuate the charity, as she had the legal estate by deed from the heir, and

[ Magill *v.* Brown. ]

possession of the land on which it was charged; and it was the most direct mode of doing it. In any other way the difficulty would have been 'great. There had been an adverse possession from the death of the testator, in 32 Hen. VIII., till the 34 Eliz., so that the heir could not have recovered possession by any other proceeding than a writ of right; if successful, he could establish the charity by his own deed, only in the grantees and their heirs, or in trustees for their use. To make a corporation, it would be necessary to apply to parliament, as in the case of the Thetford school, or to the queen for letters patent, for at this time there was no power in commissioners by any statute to establish charities on any lands except those in the king's hands under the government of special courts. If the heir had refused, the interference of chancery would have been necessary to give relief to the parties interested in the charity, if the difficulty of obtaining possession at law had been removed. By the special verdict, it appears that the testator had edified "divers meases, mansions and places convenient for a free-school," &c., (1 Co. Rep. 19 b.,) and the devise of the wharf and house was for "the maintenance of the premises in manner and form, as the said N. G. have kept and maintained the same, and as the same is now kept and maintained without any diminution in any wise." There was then a vested interest, a trust created, and *cestui que trust* in existence, and the charity was fastened on the land into whosesoever hands it came. It was binding on the heir who entered for the condition broken—"he shall perform the use because he comes in upon confidence, and the condition was compulsory to perform the use." Moore on Charitable Uses; Duke on Charitable Uses, by Bridgman, 137–8, 159–61.

If the powerful reasoning of the judges in the case of *Ingliss* v. *The Trustees*, &c., 3 Pet. 119, 140, 145, 154, is applied to Porter's Case, it is apprehended that there could be little doubt that the devise would have been carried into effect in a court of law, if the *cestui que use* of the charity had been in possession of the wharf and house; as the court of exchequer held the devise to be valid in law, and as the donor had an undoubted power over the estate, every principle and rule of equity would have induced a court of equity to compel the heir at law to have carried his intention into effect, by the exercise of its acknowledged jurisdiction over trusts. The queen by her purchase acquired only the right of the heir, she held it subject to the trust, and as the condition which created the trust appeared on the face of her title, the *cestuis que trust* could have had their remedy in the exchequer, by a bill or information in nature of a *monstrans de droit*, as fully as in the case of a charity charged upon the abbey lands by the 33 Hen. VIII. But no further proceeding was required after the adverse claim was removed; as the object was the establishment of the charity, no interference became necessary, as the power of the queen was competent to do every act in order to carry the devise into complete effect; by the mode adopted all circuity was avoided, and the object completely effected, as soon as the queen obtained possession by removing the intruder. Plowd. 561; Hard. 460; 7 Day's Com. Dig. 83.

The presumption of the want of any equitable remedy to establish and protect the charity, which has been drawn from the lapse of time from the death of the devisor till the filing of the information, is not warranted by any

[ Magill *v.* Brown. ]

thing which appears in the report of the case, and it is not to be expected that the collateral circumstances attending it can now be traced with accuracy; the one referred to in 3 Ves. 726, is satisfactory, and appears in the whole course of the argument by the counsel of the queen, to have been the only object of her interference. But whatever ground there may have been for such presumption, arising from the particular circumstances of Porter's Case, without referring to the general course of the courts of law and equity, or of the special courts or tribunals instituted by statutes prior to its decision; there certainly is the most abundant evidence that there was in some court a competent power to effectuate all lawful charities according to the intent of the donor.

The statutes and adjudications referred to are conclusive to this point, and no presumption can be permitted to overthrow their authority, unless modern doubts shall be more respected than the ancient principles of the law which governed charities before the 43 Eliz., and which have continued to this day the rules by which courts of equity have proceeded in their administration in cases not within the words or equity of that statute, as well as those expressly excluded from its operations by provisos and exceptions, as to which there can be no pretence that the statute either gave any new, or enlarged any old jurisdiction.*

There is a large class of cases expressly excepted from the jurisdiction of the commissioners by the 43 Eliz., by declaring "that this act, or any thing in it, shall not extend to any city, town corporate," or land in them, given to the uses specified, or to "colleges, hospitals or free-schools," who have special governors or visiters to govern them, to "colleges in the universities of Westminster, Eton or Winchester." 7 Day's Com. Dig. 616, N. 19.

The 39 Eliz., embraced all "colleges, hospitals, schools of learning and other places founded or ordained for charitable purposes," but it was repealed by the 43 Eliz., ch. 9; 4 Co. Inst. 167; 7 Day's Com. Dig. 614. Yet, notwithstanding the repeal of this law, and the proviso in the 43 Eliz., ch. 4, chancery has since, as they had done before, exercised a jurisdiction over them, which continues to this day, without any statutory authority, resting on its ancient basis. 2 Fonb. 208. Though the 2 Hen. V. placed hospitals under the supervision of the ordinary, yet where the "king or any of his progenitors were founders," the ordinary was not allowed to visit them; "but the chancellor of England is appointed by law to be their visiter." Co. Litt. 96 a. The king may have a prohibition to the ordinary that "he shall not visit them, because the chancellor ought to do it and no other," "so shall a private founder, if the ordinary will visit or cite any of the poor to appear before him or remove them." F. N. B. 42, 93; Reg. Br. 40; 1 Lilly Pr. Reg. 379.

The remedy must, of course, be in the temporal courts; if a resort is had

---

* The law of charitable uses has always formed a part of the civil code of Pennsylvania; the statute of 43 Eliz., as a statute, has never been adopted in this state; but its conservative provisions have been in force here, by common usage and constitutional provision; not only so, but the more extensive range of charitable uses which chancery sustained before the statute of Eliz., and even beyond it. The statute of 9 Geo. II. never was in force in Pennsylvania, and consequently the law of charitable uses here stands unaffected by it. The courts of equity in this state will not hesitate in supplying any formal defect in the execution of a power by will, in favour of a charity. *Pepper's Estate,* 1 Pars. Eq. Cas. 436.

[ Magill *v.* Brown. ]

to those of equity powers, it must be by ordinary process of a bill at the suit of a subject against subject, or by information in case the king is party, according to its ancient usages and rules, that wherever property is holden by one in trust and confidence, chancery has jurisdiction to correct fraud, accident and breach of trust. This power is exercised over the governors and visiters of colleges, hospitals and corporations, whenever they are trustees. 3 Atk. 108, 164; 2 P. Wms. 325.

Though the jurisdiction of the ordinary is expressly saved by the statute, chancery exercises the same powers over executors and administrators who hold money for charitable uses, as other trustees. It is the existence of a trust which is executory that gives jurisdiction to chancery, and not the existence of a charity recognised by a statute; a statute has a different office to perform, to remove disabilities or incapacities, imposed by statute or common law, so as to bring charities back to their original capacity, and place them within the cognizance of the appropriate courts, as if they had never been affected by any change introduced by statutes, which had embarrassed donations for uses of charity, piety and education. When that office is performed, and the case becomes disencumbered of statutory restraints, the powers of the courts are brought to act on them, as the highly favoured objects of the law; chancery especially will protect them to the extent of its judicial power as a court of equity; and, by the personal jurisdiction of the chancellor, (which he exercises in right of the crown by prerogative, under the sign manual of the king, as *parens patriæ*,) do what the king in equity and conscience ought to do. This is done in cases of charities for purposes so undefined, as not to come within the statute, or general charities, with which the commissioners have nothing to do, but must be determined by the king in chancery, on an information by the attorney general.

In a leading case on this subject, the decree of the commissioners was reversed as to a general charity, but affirmed where the objects were defined with reasonable certainty, (2 Lev. 167,) so as to come within the statute. In these three classes of cases not embraced in the statute, therefore, viz.—1, where the objects are wholly vague; 2, cases excepted; 3, cases within the jurisdiction of the ordinary, as also cases provided for by the 17 Edw. II., or 1 Edw. VI., the jurisdiction of chancery is wholly independent of its provisions, and is exercised as if it had never passed; as is strikingly exemplified in the cases of hospitals placed under the power of the commissioners by the 39th, but excluded by the 43 Eliz.; there was no ground on which chancery could take their supervision as to the execution of trusts, but by its extraordinary or personal jurisdiction existing before the 43 Eliz. It has been supposed that the latter must have been derived from the statutes, from the circumstance of there being no reported cases of its exercise antecedently: if there is any weight in this supposition, it applies with the same force for sixty years afterwards, for there is no reported proceeding in chancery on charities where the king is a party till after the restoration of Charles II.; but this circumstance is satisfactorily accounted for, by referring to former statutes.

All the lands of the abbeys, monasteries, &c., which were suppressed by the statutes of Hen. VIII. and Edw. VI. were placed in the hands of the commissioners appointed by the king, under the order and governance of the

court of augmentation of the king's revenue, which had also the exclusive cognizance of all claims for charities, charged on, or accruing from the suppressed lands, by which the king could be in any way prejudiced or affected. Keb. St. 608; 4 Co. Inst. 121; Gilb. Ex. 159; 2 Ruff. St. 226. On the abolition of this court, its powers devolved on the exchequer, without any act of parliament, (Dyer, 216 a. pl. 55; Skin. 612; 1 Bac. Abr. 597,) which had the control of the king's lands and revenues, (4 Co. Inst. 194,) before the erection of the court of augmentation, in 27 Hen. VIII., ch. 27; 4 Co. Inst. 121–2.

· The king's demesne and purchased lands, with those which accrued by forfeiture and escheat, together with all matters affecting them, were under the supervision of the exchequer, which was a court of original jurisdiction, both in law and equity, by ancient statutes and usage, in all cases affecting these lands, or any claims upon them, or his revenues or profits issuing therefrom, in which the proceedings were by bill, information, *monstrans de droit*, petition of right, or the traverse of inquisitions, as the case may be. 3 Bl. Com. 44; 2 Co. Inst. 23, 553; 4 Co. Inst. 108; 1 Bac. Abr. 597; Hob. 63; Hard. 50; 2 Lev. 34; Dyer, 303; 3 Day's Com. Dig. 312.

The court of wards and liveries was erected by the 32 Hen. VIII., ch. 46; it was a court of record and equity, in which the proceeding on the part of the king was by information in the name of the attorney general, and on the part of a subject, by the usual mode of proceeding appropriate to the jurisdiction of the court, which extended to all wardships of the king by statute, tenure or prerogative, in any lands or their issues and profits, as well as the estates of idiots and natural fools, and charities charged on the lands of his wards or tenants, which were in his wardship. 4 Co. Inst. 188, 202; Bohun Ch. C. 468; Hob. 136. The jurisdiction of the exchequer was taken away from all cases cognizable by the court of wards and liveries, (4 Co. Inst. 189,) and the statute 33 Hen. VIII., ch. 39, declared the jurisdiction of all these courts to be exclusive over the subject matter within their respective cognizance. Keb. St. 555; 2 Ruff. St. 324. The courts of augmentation, and surveyors of the king's revenues—of exchequer, and wards and liveries, had all the powers of a court of equity, in the exercise of which they proceeded by information, petition, traverse of inquisition, or English bill, and decreed for or against the king, according to the equity and conscience of the case as between subject and subject. 7 Co. Rep. 19 b.; Hardr. 27, 176, 230, 502; 4 Co. Inst. 19; Hob. 136.

A reference to matters placed under the supervision of these courts, will show conclusively, that during their existence the chancellor could in no capacity act upon charities in any case to which the king was a party in interest, or where he came into court by the attorney general; if a charity was charged upon his lands, or those he held in ward, its order and governance belonged to some of these courts exclusively, and, as *parens patriæ*, all lands so given to charities as to require his interposition by sign manual, came directly within his wardship—as in the case of infants, idiots and lunatics. 2 P. Wms. 103–118. Hence all jurisdiction over charities which were too vague and general to vest according to the ordinary rules of equity—all charities charged upon lands which would have escheated to the king or mesne lords but for the provisions of the statute of templars—all charities

[Magill *v.* Brown.]

charged on the suppressed lands for superstitious uses, which would have been seized by the king under the statutes of chauntries, but for the direction of the statute 1 Edw. VI.—and all charities charged on lands belonging to the king's wards, was devolved on the court of wards and liveries.

The powers of this court were derived from the 32 & 33 Hen. VIII., and not from the 43 Eliz., which makes no mention of it. Yet we find from Griffith Flood's Case, (Hob. 136,) the authority of which is admitted, that that court decreed the establishment of a charity out of lands in wardship of the king, Flood being his tenant; the decree was made by the ordinary power of the court, and in a case not only not within the 43 Eliz., but expressly exempted by it, as one of the colleges of Oxford; the only effect of this statute was to remove the disability on corporations imposed by the statute of wills.

While the power of this court continued, that of chancery over the subject was necessarily suspended, as the king could not proceed in it by his sign manual appointing charities, or the chancellor as his substitute; but as these charities were originally cognizable by the chancellor, and his jurisdiction ceased by being transferred to another court, and not for any want of a competent power to effectuate all its objects, it would revert to it on its abolition, as was the case of the exchequer on the abolition of the court of augmentations. The court of wards was abolished with tenures in chivalry, first by Cromwell's parliament and afterwards by the 12 Car. II., (Keb. St. 1147; 3 Ruff. 192,) but the statute contained no provision for devolving its powers on other courts. That portion of its jurisdiction which grew out of feudal tenures was of course extinct, that which was founded on the prerogative of the king in the supervision of charities, the care of lunatics, infants and idiots having been before the erection of the court of wards within the cognizance of the chancellor, returned to him as an original jurisdiction which had been merely suspended. Fonb. 207; 2 Vern. 342; 3 Bl. Com. 427-8; 2 Atk. 553; 3 Atk. 635; Mitf. Pl. 29.

When the chancellor resumed this branch of his jurisdiction the proceedings were conducted as they had originally been, and as followed by the court of wards, according to the usual course of equity in all courts, by modes of proceeding appropriate to the case, and according to the principles which had been settled by long and uniform usage in the exercise of its powers; by an authority neither conferred nor enlarged by the 43 Eliz., nor assumed from the necessity of the case on the subject of charities, more than any others to which their unquestioned jurisdiction extended.

The personal or prerogative jurisdiction of the chancellor has been and continues to be the subject of great diversity of opinion in England and this country; but the radical difference between the two governments precludes the necessity of examining the question in this case.

Here the executive of the state, or union, has no prerogative powers or authority; his sign manual can confer none on a court of chancery; the chancellor is not the keeper of his conscience, or the attorney general his representative in courts of law or equity; the rights and prerogative of the crown devolved on the several states by their declaration of independence, and the assumption of the powers of self-government. The general supervision of

[ Magill *v.* Brown. ]

infants, idiots, lunatics and charities, which thus devolved on them, can be exercised only by the authority of the legislature. A state cannot be made a party to a suit, without its consent expressed by a law or resolution, and no judicial proceeding or process by or against the attorney general, unless by the authority of the state, can prejudice its rights. He can have no control over the fund which may belong to the state by escheat, on the extinction of all the objects for which it was created, and a failure of the heirs of the donor, or which comes to the prerogative wardship of the state over persons under legal disabilities; neither can be disposed of without an act of the legislature, who are the keepers of their own conscience, as fully in relation to their prerogative rights over the property of others, as the original public domain of the state.

It suffices for the purposes of this case, to have ascertained that the original inherent powers of chancery proceeding as a court of equity, according to equity and good conscience, can be exercised by this court to the full extent of the emergency of this case, independently of the 43 Eliz., either by its enactments, or any new rules or principles of the law of equity supposed to have been developed in its exposition. Having given our views of the equity jurisdiction of the federal courts, in the case of *Baker* v. *Biddle*, we deem it unnecessary to review them, as we are fully satisfied of the correctness of the opinion there delivered. Its application to this case will be found to cover all the questions of jurisdiction which can arise.

Having disposed of the objections to the capacity of the meetings of Friends in this and other states, to take by deed or will for charitable purposes; the next subject of inquiry is as to the particular uses specified in the will—in the contested items which are,—No. 9. The eight acre lot is devised to the yearly meeting as a fund, the income of which is to be paid as an annual subscription into their stock—the application of which has been to the printing and dissemination of books and writings that have been approved of by the society. 10. The bequest of the one thousand dollars to the five monthly meetings of women friends, is for the relief of the poor members thereof. These meetings have a common stock and treasurer, and it is applied to the support of the poor, and teaching poor girls trades. 11. This is a bequest of £30, and interest from the year 1759, for the use of certain Indians. This sum appears to have been received by the father of the testatrix, from one Captain Newcastle, an Indian, for the use of his cousins, but a small part of it only was paid—the will directs this sum to be put into faithful hands, and was devised to the treasurer of the yearly meeting, for the relief and benefit of said Indians, for whose use it had been received by her father, and was evidently intended as the payment of a debt which she assumed by her will. 12. This was a legacy to the treasurer of the yearly meeting in Philadelphia, appointed to relieve the Indians, to the benefit of said Indians. The objects of the meeting are the civilization and improvement of the Indians of the Seneca and Tuscarora tribes in New York, to supply them with articles of husbandry, oxen, and iron for mills. 17. Is a like bequest to the treasurer of the Baltimore yearly meeting, for the relief, benefit, and civilization of the Indians under their care, who live in the state of Ohio. No money appears to have been expended for this object for some years past, but the committee

[Magill *v.* Brown.]

are ready to carry them into effect, if they can be found. 18. This is to Friends composing the Baltimore yearly meeting, towards their "stock," if they have one, if not, to one when it is their pleasure to establish it. It appears that this meeting had a stock at the death of testatrix, which was applied to the printing of books of a religious character, or on business of the society, the expenses of members attending the legislature, and the keeping of Friends' horses during the meeting. 19. This is a legacy to the yearly meeting at Mount Pleasant, in Ohio, for their stock, as in the preceding clause; there is no doubt they have a stock for the same purposes as other yearly meetings. 20 & 21. Are legacies to Quaker meetings in Virginia for the relief of the poor thereof—towards the enlarging their meeting house, and the erection of a stone wall to enclose the lot on which it is built—both meetings have a stock and treasurer, and all yearly meetings have a stock. 22. Is a legacy to the citizens of Winchester, in Virginia, (which is an incorporated town,) for a fire engine and hose.

It would be a waste of time to examine into the validity of these uses; as objects of charity, benevolence or liberality, by the common or statute laws of England or Pennsylvania, they are good and valid by both; (4 Wheat. 45; 17 S. & R. 93,) even the statute 9 George II., does not apply to bequests of money or personalty, and the testator has specified purposes, charitable in their nature. 2 Rop. Leg. 105–6; 9 Ves. 406.

There appears no adjudication as to a bequest for a fire engine or hose, but there needs no argument to prove it as much an object of public utility, as a session house, (Poph. 139,) a town house; (7 Johns. Ch. 294,) or of charity, as cleansing streets, (23 Hen. VIII. ch. 10,) the repairing bridges, &c. (1 Edw. VI., 43 Eliz.,) or in case of taxes and assessments for the preservation of the property of the citizens. We should administer the law of charity in this state, with little regard to its principles, in excluding from its protection so laudable an object as this.

As to the bequests for the benefit of the Indians, there can be no doubt of their being proper objects of charitable donations, as coming within what Swinburne defines, "poor miserable persons," calling for the aid of the charitable and benevolent. Swinb. 66.

They have been so recognised by the legislature of the state in the laws of 1788, incorporating a society for their relief and improvement, as a pious and charitable purpose, (Laws of 1788, p. 40,) in this particular, both judges fully concur; though there is a difference of opinion on some matters connected with this bequest, which were much dwelt on in the argument on both sides, there is none as to their being proper objects of charity, and that the uses and purposes to which the donations of the Quaker meetings are applied, are not only lawful, but in the highest degree deserving encouragement and protection. We have thus come to the conclusion, that the devise of the eight acre lot, and all the bequests in the will of Sarah Zane, which have been contested, are for pious and charitable uses and purposes, sanctioned by law.

The next inquiry is, are they so limited or appointed as to take effect for the objects intended. It must be observed, that except the 22d, the devises are all in trust for the objects of the charities; the only interest which any

[ Magill *v.* Brown. ]

of the Quaker societies have in the bequests, is in aid of their contributions for their stock, which appears to be made up by assessments on the different subordinate meetings, but they take in no other way for any individual or collective use or benefit. The organization of these meetings is very regular, though none of them are incorporated. Their gradation is,—preparative, monthly, quarterly and yearly meetings—the latter having the control of all the subordinate ones, but all composed of the same members, and each meeting has its stock and treasurer, its application being directed, by the respective meeting, to agreed, approved and definite objects.

The testatrix was a member of the Philadelphia yearly meeting, and appears to have been connected, in a friendly manner with the meetings in Baltimore, Frederick county, in Virginia, where she died; and with the meeting of Mount Pleasant, a branch from the meeting of Maryland. We must therefore presume her to be familiar with the organization and discipline of all the meetings, in all their details, as is evident from the provisions of the will. When she devotes part of her property to the stock of a particular meeting, it is most certainly her intention that it shall be applied according to its discipline and usage, as well known and understood by herself. It follows that a contribution to such stock is of the same legal effect as if the objects of its application had been specified in the will, as in the case of a devise to an hospital, or any known institution; it is for the uses and purposes intended by the founder; so a devise by way of contribution to a fund devoted to specific objects, by a society who make it up, is in law a devise to such purposes and such only, it can be directed to no other by the trustees, or a court, though the object may not be clearly defined. 1 Vern. 43, 55; 1 Eq. Cas. Abr. 99; 1 Atk. 356; 3 Merivale, 400.

It will be ascertained by usage, by the situation and circumstances of the testator, to discover what he meant, when the will gave no explanation; (2 Eq. Cas. Abr. 366, &c.; 3 P. Wms. 145,) as if he was a refugee, and devises generally to the poor, it shall be intended poor refugees of the same nation as himself, (Amb. 422; Duke on Charitable Uses, by Bridg. 494; 2 Rop. Leg. 147; S. P., Swinb. 316, 480;) or "to the charity school," and there were two in the place, evidence was received to show that the testator was fond of the children in one of the schools, and declared he would leave them something at his death. 1 P. Wms. 674–5; S. P., 2 Dall. 70–2; 2 P. Wms. 141.

That a devise to the poor of any particular parish or church is good, has been often decided, (2 Rop. on Leg. 147–8; Toth. 30,) in this case, they are more definite, being to the poor of particular meetings, which, by reference, makes the designation complete, when we advert to the master's report, finding, that, at the death of the testatrix, and before, there were meetings of the kind referred to, at each place designated by her in the will. Finch, 184, 245; 2 Lev. 167–8; 1 P. Wms. 425. The devises for the benefit of the Indians are likewise made specific by the evidence reported by the master, specifying the tribes of Indians, and the particular relief afforded by the committee during thirty years, by the expenditure of large sums of money, from time to time, under the direction of the meeting. The intention to apply the bequests in the same manner, is too apparent for any court to entertain a doubt; if any

[Magill *v.* Brown.]

could exist, or should hereafter arise, before a final decree, it is within our unquestioned powers to direct further evidence to ascertain and carry it into execution, if no other objections exist than the want of certainty in the will itself.

In 4 Wheat. 1, the devise was to "The Baptist Association that for ordinary meets at Philadelphia, annually," which "I allow to be a perpetual fund for the education of youths of the baptist denomination, who shall appear promising, for the ministry, always giving a preference to the descendants of my father's family." The court declared the association to be described with sufficient accuracy, (p. 26,) and that such a legacy would be sustained in England, (p. 29;) so that there was no doubt of the validity of the devise, had the trustees been capable of taking for the objects intended. In *Witman* v. *Lex*, the devise was "To St. Michael and Zion churches, to be laid out in bread for the poor of the Lutheran congregation, of which the testator was a member, and towards the education of young students of that congregation, under the direction of the vestrymen of the first named churches;" and held good. 17 S. & R. 90–93. So of land appropriated by deed for public uses for the benefit of the inhabitants of a town, as a majority may order and direct. 6 S. & R. 211. So of a lot marked in the plan of a town, "for the Lutheran church," for religious purposes. 2 Pet. 578. This was held good without further description of either the donees or uses, and to take effect when the church should be erected. The court took into consideration the use to which the lot had been appropriated from the time of the donation, which was for a meeting house and burying ground, and though the house had fallen down from decay, and no new one had been erected, they decreed it to be enjoyed according to the former use.

A legacy to the town of New Rochelle, to erect a town-house to transact public business in, has been held a sufficient description of the charity. 7 Johns. Ch. 294; S. P., 1 Ch. Cas. 134. Courts of chancery act under an obligation to effectuate charitable donations by all the means in their power; (2 Freem. 261, 330; 3 Mer. Rep. 391,) more liberally than in private cases, without regarding the form or prayer of the bill. 1 Atk. 356; 1 Bro. Ch. Cas. 12; 2 Ves. Sen. 426; 1 Ves. Sen. 418; 2 Eq. Cas. Abr. 198; 11 Ves. 365; 1 Ves. Sen. 468–75. It is enough that the testator expresses his general intention to establish a charity by making a donation to any object deemed charitable in law, or by using the word charity; (2 Ves. 399; 10 Ves. 535; 17 S. & R. 93; 4 Wheat. 45,) wherever a trust is created for charitable purposes, the mode by which it is to be effected, or the specific objects of its application are not material to its validity. 2 Rop. on Leg. 140, and cases cited; 3 Pet. 119; 1 Atk. 469; 3 Bro. Ch. Cas. 528; 7 Ves. 69, 86. They are put on the footing of dedications of property to public benefit, requiring no particular grantee or trustee capable of taking; though the object is not *in esse* at the time of the devise, (9 Cranch, 331–2; 2 Pet. 582–3; 6 Pet. 437,) the land remains charged with the charity in the hands of the heir till the object comes into existence; (2 Vent. 349; 3 Pet. 114–19; Bridg. Duke, 534;) so of money in the hands of a trustee, the profits accumulate for the benefit of the fund. 3 Atk. 238.

Chancery will establish the charity on the application of any person who has any interest in the fund in his own right, or as an inhabitant, or a parish

[ Magill *v.* Brown. ]

officer; (1 Ch. Cas. 134,) a member of a society having a common benefit from the donation, or a committee of a voluntary association without charter, though they could sustain no action at law; (2 Pet. 584–5,) "according to what may be collected to be the true meaning and intent of the donor, notwithstanding any failure or defect in the bequests, gifts or grants," as is correctly expressed in the rejected law of 1712. The courts of this country have gone *pari passu* with those of England, in aiding defective descriptions or designations of the places, objects or purposes of a charity, wherever they could, by the terms of the instrument, connected with extrinsic circumstances, give locality and application to the fund according to the intent of the donor as near as may be. 3 Pet. 117. Words will be construed in their most liberal and expanded meaning, in order to make out the substance of a charity capable of being aided on equitable principles, or the existence of a trust in the heir at law, devisee or executor, in the execution of which any individual or society has an interest which can be enjoyed by them, or held for their use, consistently with the terms of the donation by an equitable right; chancery will draw to it the legal interest, and give it full effect by a plan to be drawn up under the direction of the court by a master, or the trustee.*

An inscription on a tombstone has been held sufficient,(Bridg. Duke, 349–66,) or any direction by any writing, which can be deemed to be a limitation, disposition, assignment or an appointment, or gift of property to a charitable use—it will be enforced against parties and privies, except purchasers for valuable consideration of money or land, without notice of the trust—not regarding the form of the instrument. Moore, 888; Comyns, 250; Prec. Ch. 471; Sugd. Pow. 222–3. A direction by a nuncupative will, was held to be an appointment or limitation before the statute of wills. Dyer, 72, pl. 2; Swinb. 56, 68; Toth. 31.

Chancery acts whenever there is a trust, (3 Atk. 108; 2 P. Wms. 326,) which never fails for want of a trustee, (1 Penn. Rep. 51–2,) though he dies before the testatator, (2 Eq. Cas. Abr. 293; 1 Bro. Ch. Cas. 15; Amb. 571; 3 Bro. Ch. Cas. 528,) refuses to act or abuses his trust, (2 Ch. Cas. 131; 7 Day's Com. Dig. 772,) chancery will remove him and appoint another, (Ch. Rep. 78–9; 2 Eq. Cas. Abr. 194,) or compel him to assign it. Finch, 269. These are the principles of equity which the supreme court, in 17 S. & R. 91–2, declare to be the common law of the state, which have been uniformly applied as far as the powers of the courts could be extended to the exercise of chancery jurisdiction; since the acts of 1818, 1825 and 1828, they can be applied to all trusts as fully as they can be in England, by the common law of equity, or the provisions or construction of any statute. They cover all the ground of equity which it is necessary to assume for the decision of this case; the

---

* Though the objects of a charity are uncertain, a devise will not fail for want of a trustee capable of taking, if a discretionary power of selecting is vested any where. And such power may be vested in an unincorporated religious association. Thus, a devise of real and personal estate to the monthly meeting of Friends, at Philadelphia, for the northern district, (being an unincorporated religious association) to be applied as a fund for the distribution of good books among poor people in the back part of Pennsylvania, or to the support of an institution or free school, in or near Philadelphia, was established in a court of equity, against the heirs and representatives of the testator, on a bill by certain members of the meeting, on behalf of themselves and other members. *Pickering* v. *Shotwell*, 10 Barr, 23; and see *Beaver* v. *Filson*, 8 Barr, 327; *Wright* v. *Linn*, 9 Barr, 433.

[ Magill *v.* Brown. ]

defendant is a trustee for the purposes of the will; the bequests are to trus-
tees either named or designated, who are capable of holding and distributing
the funds intrusted to their management, the *cestuis que trust* are either suf-
ficiently described or easily ascertained by extrinsic circumstances, and the
uses for which the dispositions are made are not only valid, but favoured and
protected by the law, which we can effectuate without the exercise of any
personal or prerogative jurisdiction.

We shall direct the administrator *de bonis non, cum testamento annexo,* to pay
the respective bequests to the persons appointed to receive and distribute
them. They will be considered as trustees, acting under the supervision of
this court, as a court of chancery, with the same powers over trusts, as courts
of equity in England, and the courts of this state, possess and exercise.
Though our original cognizance of the case depends on the residence of the
parties to the suit, yet when the fund is under our control, we can proceed
in its final distribution among the different claimants in the same manner as
if each was a party competent to become an original complainant, by original
bill. *Baker* v. *Biddle,* MSS.

When the fund shall be so ascertained, as to be capable of a final distribu-
tion, it will be directed to be applied exclusively to the objects designated
in the will, as they existed at the time of her death, and shall continue till
a final decree; if any shall then appear to have become extinct, the portion
bequeathed to such object must fall into the residuary fund as a lapsed
legacy. Its appointment to other purposes, or *cestuis que trust,* than those
which can, by equitable construction, be brought within the intention of the
will or donor, is an exercise of that branch of the jurisdiction of the chancel-
lor of England, which has been conferred on this court by no law, and can-
not be exercised, *virtute officii,* under our forms of government.

As the amount of the personal estate is evidently far short of the legacies
made payable by the will, there must be a failure or abatement, unless the
necessary amount can be raised out of the real estate not specifically devised.
The testator having authorized the executor to sell the house in Chestnut street,
and the Marlborough estate in Virginia, his powers devolve on the adminis-
trator *d. b. n. c. t. a.,* by the acts of assembly of this state; (3 Sm. Laws,
433–4; 6 ibid. 102,) and as he is a party before us, we can compel their exe-
cution, if the laws of Virginia recognise them as competent. But he has no
*power over any other portions of the real estate,* nor are the heirs at law, or
residuary devisees, parties to the suit; so that no decree which we could make
would bind them, or the land situated in another state: our jurisdiction being
both limited and local, we cannot compel parties who reside out of the state
to appear on our process, and a sale of land in Virginia, under the authority
of the court alone, would pass no title to the purchaser.

It is an acknowledged principle that the title and disposition of real pro-
perty is exclusively subject to the laws of the country where it is situated,
which can alone prescribe the mode by which a title can pass from one per-
son to another; (7 Cranch, 116; 6 Wheat. 579; 9 Wheat. 571; 10 Wheat. 202,)
to which may be added the case of *Bryant* v. *Hunter,* to which we have
been referred, as authorizing the sale of the Virginia lands, now asked to be
directed. 2 Wheat. 32, &c. That was a suit originating in this court, affect-

2 B

[ Magill *v.* Brown. ]

ing land in Kentucky; but as only five-sixths of the land were represented by the parties to the suit, the court confined their decree of sale to the interest of the five parties before them; the sixth party in interest resided in Virginia, as to whom the supreme court declared, " That the complainant must pursue his remedy, unless her representatives shall have the prudence voluntarily to join in the sales of any land that may be made under this decree." 4 Wheat. 34, 44, 45. We are therefore following all these decisions of the supreme court, in refusing to make any further order of sale of real estate, other than the two parts thereof embraced in the power given by the will.

The decisions of the supreme court of the state, and of the high court of errors, which bear on the residuary devise in this will, may derange some of the specific devises; if the legacies are a charge on the real estate specifically devised, they might affect not only the devise of the eight acre lot, given to the yearly meeting, but other devises to persons not parties to the suit, who must be heard before we can make any decree, touching such parts of the real estate. The application of the rule laid down in *Tucker* v. *Hassenclever*, 3 Yeates, 294–99; 2 Binn. 525–31; *Nichols* v. *Postlethwaite*, 2 Dall. 131; *Witman* v. *Norton*, 6 Binn. 396; and *Commonwealth* v. *Shelby*, 13 S. & R. 348, would absorb much of the real estate to pay the legacies; but if they should be considered as a charge only on the residuary fund, according to *Shaw* v. *M'Cameron*, 11 S. & R. 252, they will not affect the devised lands. On this point we have formed no opinion.

It remains only to apply the foregoing view of the law of Pennsylvania to the dispositions of the will in question.

1. To the devise of the eight acre lot to the yearly meeting. We know historically that this has been a religious society from the settlement of the province. We know, from the acts of the legislature, that they have held real estate, and yet hold it, under deeds from the proprietor, from individuals, and by the laws of the state, guarantied by all its constitutions, have a perfect right and capacity to take, hold and enjoy property without incorporation, or tenure in mortmain.

2. The bequest to the monthly meetings of women friends, is for a charitable use, which is good and lawful, and they are capable of taking and distributing the charity, according to the will of the donor, in the most liberal and ample sort.

3. The bequest of the thirty pounds received by the father of the testatrix from Captain Newcastle, and the interest, we consider to be intended as the payment of a debt which she considered herself to be morally and equitably bound to pay, and therefore direct it to be paid by the executor, as a debt of the estate, to such Indians as are the relations of the said Newcastle, if to be found; if not to be found, to remain subject to the future order of the court.

4. As to the devises to the Indians, our opinion is, that they are good and valid. That the treasurer of the societies or meetings, or their committees for the time being, are capable of taking and distributing the fund as a trustee under their direction, and that Indians are proper objects of charitable bequests. But they are to be applied to the relief of such Indians as have heretofore been under the care and supervision of the yearly meetings, or

[ Magill *v*. Brown.]

their committees respectively, and to be distributed only for such objects and purposes as were customary in the lifetime of the testatrix, such being her manifest intention.

5. As to all the devises to or for the benefit of the different meetings of Friends in Baltimore, Virginia and Ohio, we are clearly of opinion that they are good and valid in law, and decree accordingly.

6. As to the bequest to the citizens of Winchester, to purchase a. fire-engine, we consider it good as a charitable use, or one tending to public profit and the safety of property, and in ease of taxes and burdens on the citizens; this is the substance and intent of the bequest, and being given for a good and meritorious object, it is not material by what name it is given, whether to the corporation, or the citizens who compose it, it must take effect, notwithstanding any misnomer or other defects of name, form or circumstance.*

7. The bond of Isaac Zane appearing to us to have been assumed by the testatrix as honestly due by one of her near relations, ought to be considered in equity as a debt due, and be paid by the executor out of her estate, as such was evidently her intention, and from the evidence reported by the master, we think the party now before the court entitled to receive it, and decree accordingly.

8. We order and decree that the administrator *de bonis non* make sale of the house and lot in Chestnut street, at such time and place as the court may hereafter direct, or private sale, at his discretion.

9. Also to make sale of the Marlborough estate in Virginia, in the same manner, if such sale is authorized by the law of Virginia. If such sale is not authorized, then we order and direct the administrator to make application for such authority to the legislature or such judicial tribunal as by the law of that state is competent to authorize such sale, according to the will of the testatrix, or the order of this court.

We have been asked to go farther, and decree a sale of all the undevised estate of the testatrix, as necessary to provide a fund to meet the various legacies and bequests;—the counsel who made the application considering that the residuary clause in the will was to be so construed, that nothing should pass under it till all the former dispositions were satisfied. As the residuary devisees are not before the court, and would not be bound by its decree, we have not considered, and shall express no opinion on that subject —having no power to affect real property in another state, but through the parties in interest, or those having power over it, we must confine our order for the sale of the estate to such parts of it as are in the hands, or within the control of the administrator under the authority of the will. We have full power to see that the will be faithfully and religiously observed and executed, but none to order a sale not directed to be made by any of its provisions.

---

* A voluntary association of individuals, who have contributed funds for a public purpose, will be regarded as a charity, and a court of equity in this state has jurisdiction over the parties. Funds supplied by the gift of the crown, or from the legislature, or from private gift, for legal, general or public purposes, are charitable funds, to be administered by a court of equity. Therefore, where money is given by will, gift, or voluntary contribution of individuals, to a voluntary, unincorporated ' hose company, or fire association, formed for general and public usefulness, without individual emolument or advantage, it is a charity over which a court of equity will exercise control. *Thomas v. Ellmaker*, 1 Pars. Eq. Cas. 98.